UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Date of Service: August 17, 2020

ISSAC PASCHALIDIS,

                Plaintiff,

-against-

THE AIRLINE RESTAURANT CORP.,
JAMES MESKOURIS, PETER
GEORGE MESKOURIS, and John Does
#1-10,

                Defendants.

Index No.: 20:Civ. 2804 (LDH)(RLM)

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

By:  Joshua Marcus, Esq.
      FRANKLIN, GRINGER & COHEN, P.C.
      *Attorneys For Defendants*
      666 Old Country Road, Suite 202
      Garden City, NY 11530-2013
      (516) 228-3131

# Table of Contents

TABLE OF AUTHORITIES...............................................................................................i

INRODUCTION...............................................................................................................1

SUMMARY OF PROCEEDINGS....................................................................................2

FACTS ALLEGED IN THE COMPLAINT.....................................................................3

ARGUMENT.....................................................................................................................6

    POINT I: Motion To Dismiss Standard.................................................................6

    POINT II: Plaintiff's First And Second Causes Of Action For Unpaid Minimum Wage And Wages Pursuant To The FLSA And NYLL Should Be Dismissed.............................................................................................................8

        A. Plaintiff's FLSA and NYLL Claims are Barred by the Business Owner Exemption.....................................................................................................8

        B. Plaintiff Has Failed To Sufficiently Allege Facts Which Would Raise A Plausible Inference Of An FLSA And/or NYLL Minimum Wage Violation.............................12

        C. Plaintiff is An Employer Pursuant To The FLSA And New York Labor Law And Is Not An Employee For Purposes Of Those Statutes........................................................................................................15

    POINT III: Plaintiff's Seventh Cause Of Action For NYLL Wage Notice Requirements Should Be Dismissed..............................................................................................................17

    POINT IV: Plaintiff's Sixth Cause Of Action For Retaliation Pursuant To the New York Labor Law Should Be Dismissed.........................................................................................18

    POINT V: Plaintiff's Third Cause of Action For Age Discrimination Pursuant To The NYSHRL Should Be Dismissed.........................................................................................19

    POINT VI: Plaintiff's Fourth Cause Of Action For Age Discrimination Pursuant To The NYCHRL Should Be Dismissed.........................................................................................20

CONCLUSION...............................................................................................................21

## Table of Authorities

### Cases

*Amash v. Home Depot., USA, Inc.,* 24 F. Supp.3d 214 (N.D.N.Y. 2014)...................................................................................... 8

*Annuity Trust Fund v. Smith Barney Fund Management, LLC,* 595 F.3d 86 (2d Cir. 2010)...................................................................................... 6

*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)...................................................................................... 6

*Barfield v. N.Y.C. Health & Hosps. Corp.,* 537 F.3d 132 (2d Cir. 2008)...................................................................................... 16

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed..2d 929 (2007)...................................................................................... 6

*Berman v. Sugo, LLC,* 580 F. Supp. 2d 191 (S.D.N.Y. 2008)...................................................................................... 7

*Bustillos v. Academy Bus LLC,* 2014 WL 116012 (S.D.N.Y. 2014)...................................................................................... 13

*Carter v. Dutchess Cmty. Coll.,* 735 F.2d 8 (2d Cir. 1984)...................................................................................... 16

*Corley v. Jahr,* 2013 WL 265450 (S.D.N.Y. 2013)...................................................................................... 8

*Cortec Inds., Inc. v. Sum Holding, L.P.,* 949 F.2d 42 (2d Cir. 1991)...................................................................................... 7

*Dejesus v. HF Mgmt. Servs.,* 7226 F.3d 85 (2d Cir. 2013), *cert. denied,* 134 S. Ct. 918 (2014)...................................................................................... 12,15

*Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.,* 770 F. Supp. 2d 497 (E.D.N.Y. 2011)...................................................................................... 6

*DiPilato v. 7-Eleven, Inc.* 662 F. Supp.2d 333 (S.D.N.Y. 2009)...................................................................................... 19

*Encino Motorcars, LLC v. Navarro,* 1138 S. Ct. 1134, 2000 L. Ed.2d 433 (2018)...................................................................................... 9

*Gisomme v. HealthEx Corp.,* 2014 WL 2041824 (E.D.N.Y. 2014)...................................................................................... 13

i

*Grella v. St. Francis Hosp.,* 149A.D.3d 1046, 53 N.Y.S.3d, 330 (2d Dept. 2017)................................................................................................. 18,19

*Herman v. RSR Sec. Services, Ltd.,* 172 F.3d 132 (2d Cir. 1999)..................................................................................................... 16

*Hirsh v. Arthur Anderson & Co.,* 72 F.3d 1085 (2d Cir. 1995)..................................................................................................... 14

*I Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.,* 936 F.2d 759 (2d Cir. 1991) ................................................................................................. 7

*Int'l Audiotext Network Inc. v. American Telegraph Co.,* 62 F.3d 69 (2d Cir. 1995)..................................................................................................... 7

*Lundy v. Catholic Health Sys. Of Long Island Inc.,* 711 F.3d 106 (2d Cir. 2013)..................................................................................................... 12,15

*Manning v. HealthFirst, LLC, OATH* Index No. 462/05 (Mar. 15, 2005)..................................................................................................... 20

*Moon v. Kwon,* 248 F. Supp.2d 201 (S.D.N.Y. 2002)..................................................................................................... 16

*Nakahata v. New York Presbyterian Healthcare Sys.,* 723 F.3d 192 (2d Cir. 2013)..................................................................................................... 12,15

*Romero v. HB Automotive Group, LLC,* 2012 WL 1514810 (S.D.N.Y. 2012)..................................................................................................... 10

*Roth v. Jennings,* 489 F.3d. 499 (2d Cir. 2007)..................................................................................................... 7

*Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S. Ct. 1472, 91 S. Ct. 1473, 91 L. Ed.2d 1772 (1947)...................................................................................... 17

*Spiteri v. Russo, 2013 WL 4806960 (E.D.N.Y 2013)* ................................................................................................. 14

*Tomka v. Seiler Corp.* 66 F.3d 1295 (2d Cir. 1995)..................................................................................................... 8

*U.S. Bank Nat'l Ass'n v. Bank of A.M., N.A.,* 2012 WL 6136017 (S.D.N.Y. 2012)..................................................................................................... 8

## Statutes & Regulations

Fair Labor Standards Act, 29 U.S.C. §§201 et. seq.................................................................................... 1

Fair Labor Standards Act, 29 U.S.C. §203 (d)....................................................................................... 8

Fair Labor Standards Act, 29 U.S.C. §213 (a)(1)..................................................................................... 15

New York Executive Law § 292 (5) and (6)............................................................................................ 15

New York Labor Law § 190 (3)........................................................................................................... 15

New York Labor Law § 191............................................................................................................... 15

New York Labor Law § 215............................................................................................................... 18

N.Y.C. Admin. Code § 8-102(9)........................................................................................................ 20

## INTRODUCTION

Defendants, The Airline Restaurant Corp. (hereinafter "Airline"), James Meskouris, and Peter George Meskouris (hereinafter collectively "Defendants"), bring this motion to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6) on the basis that Plaintiff Isaac Paschalidis (hereinafter "Paschalidis") has failed to state claims upon which relief can be granted. Specifically, Plaintiff's claim for unpaid minimum wages and wages brought pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. (the "FLSA") and New York Labor Law ("NYLL") should be dismissed on the basis that Plaintiff's pleadings demonstrate that he was exempt from such statutes as a business owner since Plaintiff has plead that he is a twenty-five percent owner and primarily worked as General Manager during which time he oversaw and managed the diner and staff.

Additionally, Plaintiff has failed to plead specific facts setting forth a plausible claim of unpaid overtime pursuant to those statutes because Plaintiff is an employer and not an employee pursuant to such statutes. Similarly, Plaintiff's claim for failure to receive a wage notice pursuant to the NYLL fails as Plaintiff was not an employee pursuant to such statute.

Plaintiff's NYLL claim for retaliation fails as Plaintiff is not an employee pursuant to such statute, and Plaintiff has failed to plead any specific violations of the NYLL that he complained of to Defendants. Further, Plaintiff's claims pursuant to the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") are improperly plead as Plaintiff is not an employee but rather an employer pursuant to those statutes. Accordingly, for the reasons set forth herein, Plaintiff's Complaint should be dismissed in its entirety.

1

## SUMMARY OF PROCEEDINGS

On April 13, 2020, Plaintiff filed a complaint (the "Complaint")[1] in the Southern District of New York. Plaintiff's Complaint contains claims for unpaid minimum wages and wages pursuant to the FLSA and NYLL. Marcus Aff., Ex. A, pp. 9-10. Plaintiff also brought a separate NYLL Labor Law claim asserting he was not provided a wage notice in violation of the NYLL. *Id.*, pp. 13-4. Plaintiff also asserted claims of retaliation pursuant to the FLSA and NYLL. *Id.*, pp. 11-13. Plaintiff also asserted claims of age discrimination pursuant to the NYSHRL and NYCHRL. *Id.*, pp. 10-1. Such claims are not limited to any time period other than their applicable statute of limitations.

On June 15, 2020, Defendants filed a letter with the Court requesting a pre-motion conference to address its proposed motion to dismiss the Complaint and/or change venue. On June 22, 2020, Plaintiff submitted a letter in opposition. After a pre-motion conference with the Honorable Edgardo Ramos, Judge Ramos transferred the matter to the United States District Court, Eastern District of New York but did not address the other arguments concerning Defendants' anticipated motion. After a pre-motion conference with Your Honor on July 20, 2020, Your Honor set forth a briefing schedule for Defendants' motion.[2]

---

[1]      The Complaint is annexed to the Affirmation of Joshua Marcus (herein "Marcus Aff."), dated August 17, 2020 as Exhibit A.

[2]      During that pre-motion conference, Plaintiff withdrew his fifth cause of action (FLSA retaliation) on the basis that he did not make any complaints to the USDOL nor filed a lawsuit prior to Defendants' alleged purported retaliatory actions. Accordingly, this motion does not contain argument regarding the sufficiency of such cause of action. Accordingly, Plaintiff's FLSA claim for unpaid minimum wages is Plaintiff's only remaining federal claim.

## FACTS ALLEGED IN THE COMPLAINT[3]

In his Complaint, Plaintiff Paschalidis asserts Defendants own operate or control a restaurant operating as "Jackson Hole" and the "Airline Diner" located in East Elmhurst, New York. See Marcus Aff., Ex. A, ¶ 10. He further asserts that from "inception in 1989, Paschalidis was and is a minority shareholder of the Airline Diner with twenty-five (25%) percent of its outstanding stock and an officer and director serving as its Treasurer." Ex. A, [second] ¶ 12. Plaintiff further asserts that as a shareholder and manager, Paschalidis was exempt from overtime. *Id.*, ¶ 22.[4]

Notably, the Complaint asserts he was "primarily employed as a general manager, managing the Airline Diner and overseeing and managing its staff." *Id.*, ¶ 20 (emphasis added). The Complaint further states that he worked as general manager from 1989 until February 6, 2020 and that during the last six years, Paschalidis worked between 46 and 60 hours a week." *Id.*, ¶¶ 21, 23 (emphasis added). The Complaint also asserts Plaintiff received weekly profit distributions and weekly wages of $2,300.00. *Id.*, ¶¶ 24, 31.

In his Complaint, Plaintiff asserts that in January 2018, James and Peter Meskouris (herein the "Individual Defendants") began to shift Paschalidis out of the business, restrict his access to records, and inform the Airline Diner employees that Paschalidis had "no authority" and "not to listen to him but only the shift manager" or the Individual Defendants. *Id.*, ¶ 25. He

---

[3]     Defendants vigorously dispute the allegations in Plaintiff's Complaint, and it is Defendants' assertion that Plaintiff's Complaint was brought in a preemptory manner arising from an ownership dispute with Defendants regarding his failure to perform his duties. However, for the purpose of Defendants' motion to dismiss, the facts asserted in Plaintiff's Complaint will be deemed true.

[4]     Yet, Plaintiff claims that "at all times relevant to this action he was an employee within the meaning of the FLSA, the Hospitality Wage Order, the NYMWA and the NYPWA" and the Executive Law and the City law. *Id.*, ¶¶ 14, 16.

further claims in January 2018, other corporate formalities were not met, such as providing

Plaintiff with access to payroll records, schedules or lists of employees, and that Defendants

prevented Plaintiff from seeing documents relating to the general revenue of the business or

payday payouts to employees. *Id.*, ¶¶ 26-29. Plaintiff further asserts that after January 2018,

shareholder, officer or director meetings were not held, and Defendants misappropriated

corporate assets. *Id.* Plaintiff further claims he was not paid for shifts or distributions until after

August 2018 when he was paid $500.00 a week or $1,000.00 per week. *Id.*, ¶ 32. Plaintiff asserts

that during that time he continued to work the same number of shifts as before and "even

covered shifts for other shareholders when they requested the same." *Id.*, ¶ 34.

Plaintiff asserts that in 2019 comments were made by other owners concerning Plaintiff's

involvement with Airline Corp. Plaintiff claims that in 2019 Defendant Peter Meskouris told

Plaintiff he was "running things now" and "you are not the owner here. I am the owner." *Id.*, ¶¶

42-43. Plaintiff further asserts that in September 2019, he was removed as a signatory to the

operating account, and when Plaintiff complained about that and not seeing corporate records

and other revenue documents, Peter Meskouris told him, "I can do whatever I want and you can't

do anything about it." *Id.*, ¶¶ 44-45. Plaintiff also asserts that two weeks later in September 2019

the night shift manager's employment was terminated, and Peter Meskouris told Paschalidis

"now you have to close the store everyday by yourself and you will suffer because you are too

old." *Id.*, ¶¶ 47-48. He also claims that in December 2019 Peter Meskouris told Paschalidis he

wanted him out of the business and made other comments such as calling him a "piece of s***",

"a nobody," told him he was too old to handle working without a manager, claimed he would fire

Plaintiff's family members working at the diner, and "would falsely tell your wife that you are

having an affair with the waitress and he would 'ruin [plaintiff's] son and daughter's

4

reputations.'" *Id.*, ¶¶ 50-51. Plaintiff further claims that Peter Meskouris hung up the phone on

him the next day and told him "Airline Diner's money was 'mine and only mine' and told

Plaintiff the next day 'don't ever f****** call me again, old man." *Id.*, ¶¶ 53-54. Plaintiff claims

he worked his standard hours as general manager from January 22, 2020 through February 6,

2020 until his employment was terminated on February 6, 2020. *Id.*, ¶¶ 60-1.

### A. The December 26, 2019 Letter

Plaintiff in his Complaint asserts that on December 26, 2019, he had his attorney write a

letter to Defendants demanding an accounting and sought to resolve differences he had with the

Defendants. *Id.*, ¶ 57. Although such letter is referenced in Plaintiff's Complaint, he did not

attach such letter to Plaintiff's Complaint. Notably, in such letter, Plaintiff states he "has been a

working partner, shareholder, and corporate Secretary of the Corporation for 30 years." See the

December 26, 2019 letter annexed as Ex. B to the Marcus Aff., p, 2. Yet, nowhere in this letter

does Plaintiff state that his job duties had changed. Rather, Plaintiff states that he continued to

work the same hours he always had and was asked to work more hours. *Id.*, p. 2. The letter also

notes that a night manager was terminated, and Plaintiff had to close the restaurant without

assistance of any night manager, thereby making Plaintiff the only manager on site. *Id.* Plaintiff

also complains that his salary and distributions were reduced in 2018 but does not state at any

point that they were eliminated. *Id.* Additionally, while Plaintiff complains owner Defendant

Peter Meskouris allegedly made false comments concerning Plaintiff, nowhere in this letter does

Plaintiff allege that his actual job duties had changed.

# ARGUMENT

## POINT I

### MOTION TO DISMISS STANDARD

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, supra, 550 U.S. at 555). A complaint must therefore contain more than "'naked assertions' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, supra, 550 U.S. at 557). Moreover, while a court reviewing a Fed. R. Civ. P. 12(b)(6) motion to dismiss must generally deem all allegations of fact in a complaint to be true, this "tenet . . . is inapplicable to legal conclusions." *Id.*; *see also Twombly*, supra, 550 U.S. at 555 (explaining that courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). A complaint has facial plausibility only if it pleads a "set of facts sufficient to 'raise a right to relief above the speculative level.'" *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 506 (E.D.N.Y. 2011) (quoting *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 91 (2d Cir. 2010)).

A. Documents Outside The Complaint A Court Can Consider On A Motion To Dismiss

A court may not review documents other than the complaint in ruling on a motion made pursuant to Fed. R. Civ. P. 12(b)(6) without converting the motion to summary judgment except that "[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered. In addition, even if not attached or

incorporated by reference, a document, upon 'which [the complaint] solely relies and which is integral to the complaint' may be considered by the court in ruling on such a motion." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Documents referred to in a complaint to which Plaintiff had access can be deemed to be incorporated by reference and can be considered on a motion to dismiss. See *Cortec Inds., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47-8 (2d Cir. 1991) ("[W]hen a plaintiff chooses not to attach the complaint or incorporate by reference a [document] by which it solely relies and which is integral to the complaint, the defendant may produce the [document] when attaching the complaint for its failure to state a claim, because plaintiff should not be easily allowed to escape the consequence of its own failure . . . Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.") The Second Circuit has subsequently held several times that documents specifically referenced in a complaint upon which a plaintiff has relied upon in drafting a complaint and which a plaintiff has actual notice of can be considered in a motion to dismiss without converting such motion to a summary judgment motion. See *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (holding a plaintiff cannot evade a motion to dismiss "simply because plaintiff has chosen not to attach the document to the complaint.") *Int'l Audiotext Network, Inc. v. American Telegraph Co.*, 62 F.3d 69, 70-2 (2d Cir. 1995) (holding document upon which plaintiff relies heavily upon its term and effect should be incorporated by reference and considered on a motion to dismiss); *Berman v. Sugo,* LLC, 580 F. Supp.2d 191, 201 (S.D.N.Y. 2008) (same).

Herein, Plaintiff clearly incorporates his counsel's December 26, 2019 letter to Defendants by reference. (See Ex. A, ¶ 57). Further, it is clear Plaintiff relied upon such

document in drafting its Complaint in the instant action, and Plaintiff had actual notice of the existence of such document. *Id.* Accordingly, it should properly be considered in connection with Defendants' motion to dismiss.[5]

## POINT II

### PLAINTIFF'S FIRST AND SECOND CAUSES OF ACTION FOR UNPAID MINIMUM WAGE AND WAGES PURSUANT TO THE FLSA AND NYLL SHOULD BE DISMISSED

As set forth below, Plaintiff's FLSA claims for unpaid minimum wage and wages must be dismissed as Plaintiff's Complaint demonstrates: (1) Plaintiff is exempt by the business owner exemption; (2) Plaintiff has failed to plead such claims with the proper specificity; and (3) Plaintiff is an employer and not an employee pursuant to such statutes.

A.     Plaintiff's FLSA and NYLL Claims are Barred by the Business Owner Exemption.

Plaintiff has asserted that he was not paid minimum wages in violation of the FLSA and NYLL.[6] See Ex. A, ¶¶ 64-71.[7] While the FLSA typically requires employees to be paid minimum wage, certain exemptions apply. 29 U.S.C.§ 213 (a)(1) sets forth the general

---

[5]     Plaintiff subsequently filed a Complaint in New York State Court seeking an accounting and asserting several claims pursuant to the NY Business Corporation Law as well as a motion for TRO relating to his ownership interest in Airline. See Marcus Aff., Ex. C. Although allegations in that Complaint further demonstrate Plaintiff was not an employee, such Complaint is not incorporated by reference to the Complaint in this action. However, this Court may take judicial notice that Plaintiff filed such Complaint in his capacity as an owner. See *Corley v. Jahr*, 2013 WL 265450 * 5-6 (S.D.N.Y. 2013) (court may take judicial notice of pleadings and papers filed in another matter).

[6]     The NYLL also has an executive exemption which as to duties is nearly identical, and courts typically analyze such exemptions similarly. See e.g., *Amash v. Home Depot, U.S.A., Inc.*, 24 F. Supp.3d 214, 218-9 (N.D.N.Y. 2014).

[7]     Plaintiff is not seeking overtime and acknowledges in his Complaint he is exempt from overtime. See Ex. A, ¶ 22.

exemption to minimum wage and overtime as it relates to persons employed in a bona fide

executive, administrative or professional position. 29 U.S.C. §213(a)(1) states:

> (a)Minimum wage and maximum hour requirements. The provisions of sections
> 206 (except subsection (d) in the case of paragraph (1) of this subsection) and 207 of this
> title shall not apply with respect to—
> (1) any employee employed in a bona fide executive, administrative, or professional
> capacity . . . .

Defendants bear the burden of proving that Plaintiff is exempt from coverage pursuant to

the FLSA. *Reich v. State of New York*, 3 F.3d 581, 586 (2d Cir. 1993). However, as recently held

by the Supreme Court, exemptions to the FLSA should not be considered narrowly. See *Encino*

*Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142, 200 L. Ed.2d 433 (2018).

Regulations promulgated by the USDOL pursuant to the FLSA delineate that business

owners qualify for the executive exemption set forth in 29 U.S.C. § 213(a)(1) without having to

meet the salary requirements typically needed to qualify for the executive exemption.[8]

Specifically, 29 C.F.R. 541.101 and 102 states:

> § 541.101 Business owner.
> The term "employee employed in a bona fide executive capacity" in section
> 13(a)(1) of the Act also includes any employee who owns at least a bona fide 20-
> percent equity interest in the enterprise in which the employee is employed,
> regardless of whether the business is a corporate or other type of organization, and
> who is actively engaged in its management. The term "management" is defined
> in § 541.102. The requirements of Subpart G (salary requirements) of this part do
> not apply to the business owners described in this section.

> § 541.102 Management.
> Generally, "management" includes, but is not limited to, activities such as
> interviewing, selecting, and training of employees; setting and adjusting their
> rates of pay and hours of work; directing the work of employees; maintaining
> production or sales records for use in supervision or control; appraising
> employees' productivity and efficiency for the purpose of recommending
> promotions or other changes in status; handling employee complaints and

---

[8]     The USDOL in implementing this rule, acknowledged that business owners would likely be paid in equity,
dividends or other forms besides a salary thereby finding that the exemption as it relates to business owners need not
require a salary component. See 69 FR 22122-01, 2004 * 15-16.

grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

In setting forth such exemptions, the USDOL made it clear that the "actively engaged" requirement was added to ensure that an employer would not seek to circumvent such rules by giving an employee an illusory interest in a company. See 69 FR 22122-01, 2004 * 15-16.

Accordingly, pursuant to such exemption, business owners who have a twenty-percent equity interest and who are actively engaged in management are exempt from the overtime and minimum wage provisions of the FLSA. Herein, there does not seem to be any dispute that Plaintiff was for all relevant times a twenty-five percent owner of Airline Corp. See Marcus Aff., Ex. A, [second] ¶ 12 ("from his inception in 1989, Paschalidis was and is a minority shareholder of the Airline Diner with twenty-five (25%) percent of its outstanding stock and an officer and director serving as its Treasurer"). What seems to be in contention was whether Plaintiff was "actively engaged in management." In his Complaint, Plaintiff asserts he was "primarily employed as a general manager, managing the Airline Diner and overseeing and managing its staff." *Id.*, ¶ 20. (emphasis added). While Plaintiff further states "His responsibilities included just not overseeing employee work, but performing staff duties such as operating the cash register, seating guests, cleaning tables, taking phone orders for delivery or pick up, and taking orders and serving customers seated at the counter," Plaintiff clearly states that his primary duties (i.e., most important duty) was as a general manager overseeing the diner and its staff. *Id.* See also *Romero v. HB Automotive Group, LLC*, 2012 WL 1514810 * 15 (S.D.N.Y. 2012) (dismissing claim on summary judgment on basis plaintiff plead she was primarily engaged in

10

the selling of automobiles and thus by plaintiff's own pleading she was exempt from the FLSA). Thus, by a fair reading of Plaintiff's Complaint, Plaintiff has plead that his primary duties encompassed the management duties articulated in 29 C.F.R. § 541.02.

Moreover, Plaintiff in his Complaint admits that "as a shareholder and a manager [plaintiff] was exempt from overtime." See Marcus Aff., Ex. A, ¶ 22. Again, Plaintiff's Complaint does not state that such status ever changed, and Plaintiff's Complaint contains no claims for overtime. Yet, the exemption from overtime as a manager and shareholder would presumably be as an executive as set forth in 29 U.S.C. § 213(a)(1) and/or as a business owner as set forth pursuant to the USDOL's regulations. Both the executive and business owner exemptions exempt not only overtime but minimum wage. See 29 U.S.C. § 213(a)(1). Simply put, if Plaintiff is exempt from overtime requirements, as acknowledged by Plaintiff, he must also be exempt from the obligation to pay minimum wage.

Further, Paragraph 12 of Plaintiff's Complaint does not state that limitations on that role were ever made at any time.[9] Rather, his Complaint states that he worked as general manager from 1989 until February 6, 2020. Marcus Aff., Ex. A, ¶ 23. Plaintiff's Complaint does state that in January 2018, he was denied access to financial records and that employees were allegedly told not to listen to Complainant but to the Shift Manager and that derogatory comments were made toward Plaintiff. *Id.*, ¶¶ 25-29, 42-55. Yet, nowhere in his Complaint does Plaintiff set

---

[9]     The USDOL Field Handbook makes it clear that the standards for the business owner exemption are not onerous and that an employee would not qualify for the exemption when such business owner "is required to work long hours, make no management decisions, supervise no one and has no authority over personnel matters". See US DOL Field Handbook Chapter 22b05, 69 FR 22122-01, 2004 * 15-16. Further, regulations relating to the job duties test of the executive exemption make it clear that the executive duties must be primary in nature and in making such determination they must be customary and regular as opposed to occasional. See 29 C.F.R. § 541.701. In making such determination, a week by week analysis of job duties is not performed. *Id.* Defendants submit that the language of the business owner exemption which states that the employee must merely be actively engaged in management responsibilities does not require a week by week analysis and the overriding description of Plaintiff's "primary duties" as set forth in the Complaint demonstrates Plaintiff is exempt.

11

forth that his <u>actual</u> job duties changed. Instead, Plaintiff in his Complaint asserts that the night shift manager was terminated in 2019, and he was required to close the store. *Id.*, ¶ 47.[10] By implication, without a night shift manager or anyone else in charge, Plaintiff concedes he would be the only person able to perform managerial duties on the night shift.

Further, Plaintiff's December 26, 2019 letter, which is incorporated by reference to the Complaint, also fails to assert that Plaintiff's duties changed. Rather, this letter states he has been a working partner for the last thirty years, has worked the same or more hours in 2019, was paid a salary and profit distributions at all times (although they were reduced in 2018), and he was required to close the restaurant with no manager present five of the seven nights. See Ex. B, p. 2. As Plaintiff admits he was always a working owner, and he does not state that his job duties changed at any time, Plaintiff is exempt and his FLSA and NYLL claims for unpaid minimum wages should be dismissed.

B.      Plaintiff Has Failed To Sufficiently Allege Facts Which Would Raise A Plausible Inference Of An FLSA And/or NYLL Minimum Wage Violation.

The Second Circuit has recently decided three cases regarding the standard of proof needed to assert a viable claim pursuant to the FLSA. In *Lundy v. Catholic Health Sys. Of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013), *Nakahata v. New York-Presbyterian Healthcare Sys.*, 723 F.3d 192, 201 (2d Cir. 2013); *Dejesus v. HF Mgmt. Servs.*, 726 F.3d 85, 89 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 918 (2014), the Second Circuit stated that claims set forth pursuant to the FLSA must be "plausible". A plaintiff may not track "the statutory language of the FLSA, lifting its numbers and rehashing its formulation, but alleging no particular facts sufficient to raise a plausible inference of an FLSA . . . violation." *Dejesus v. HF Mgmt.*

---

[10]     This point is further corroborated by Plaintiff's Memorandum of Law Supporting Plaintiff's Motion For A TRO (page 2) in which Plaintiff's attorney states, "[u]ntil being terminated on February 7, 2020 Paschalidis remained a working partner 50 to 55 hours per week."

*Servs.*,726 F.3d 85, 89 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 918 (2014). Thus, as an example a plaintiff may not merely allege only that in 'some or all weeks' she worked more than 'forty hours' a week without being paid '1.5' times her rate of compensation" but rather must provide some factual context that will 'nudge' their claim 'from conceivable to plausible.'" *Id.* at 90 (internal citations omitted) (quoting *Lundy*, supra, 711 F.3d at 114 and *Twombly*, supra, 550 U.S. at 570); See also *Bustillos v. Academy Bus, LLC*, 2014 WL 116012, at *3 (S.D.N.Y. 2014) (holding plaintiff's allegations must reflect an effort to draw on his "memory and experience" to provide the "sufficiently detailed factual allegations" required by the Second Circuit).

In subsequent decisions in the Second Circuit, courts have dismissed FLSA claims where the plaintiff has merely asserted in conclusory fashion that they regularly or on average worked over forty hours a week without pleading sufficient details concerning their schedule of hours which would nudge a claim from conceivable to plausible. In *Bustillos v. Academy Bus, LLC*, 2014 WL 116012, at *3 (S.D.N.Y. 2014), the court found that plaintiff's allegation that he "'would regularly work from 60-90 hours per week' is equivalent to the allegations in *Dejesus* and *Nakahata*" and dismissed plaintiff's complaint. Notably, in *Bustillos*, supra, 2014 WL 116012 at * 4 the court cautioned that Second Circuit case law requires a "'factual context' that 'nudges' the claims from conceivable to plausible." See also *Gisomme v. HealthEx Corp.*, 2014 WL 2041824 at * 3 (E.D.N.Y. 2014) (plaintiff must provide "sufficient detail about the length and frequency of their unpaid work.")

Plaintiff in his Complaint in mere conclusory fashion asserts he was a general manager of Airline Corp. and was paid a weekly wage of $2,300.00 a week. Marcus Aff., Ex. A, ¶¶ 20, 24. Plaintiff also alleges that in January 2018, Defendants ceased paying his salary for over six months during which time he also did not receive any corporate distributions. *Id.*, ¶¶ 29, 31.

13

Plaintiff further states that in August 2018, he was paid $500.00 a week for several weeks and then was paid $1,000.00 and was told by Defendants that the business was not making enough money to pay him $2,300.00 a week. *Id.*, ¶¶ 32, 35. Yet, in his December 26, 2019 letter Plaintiff instead asserts his salary was "slashed" more than 75% from its established rate over the last five years to $28,000 and his weekly profit distributions "have evaporated into essentially nothing." See Marcus Aff., Ex. B, p. 2. Thus, Plaintiff's vague and conclusory statement that he received no salary or weekly profit distributions is expressly contradicted by his counsel's December 26, 2019 letter (and which is incorporated by reference to Plaintiff's Complaint) which states that Plaintiff received a reduced salary and weekly profit distributions.

Courts have held that while a plaintiff is permitted to plead alternative theories of liability, "[w]here plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." *See U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*, 2012 WL 6136017, at *7 (S.D.N.Y. Dec. 11, 2012) (internal quotation marks and citation omitted). Further, "[w]here an allegation in the complaint conflicts with other allegations, or where the plaintiff's own pleadings are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint, the court is neither obligated to reconcile the pleadings with the other matter nor accept the allegation in the pleadings as true in deciding a motion to dismiss." *Spiteri v. Russo*, 2013 WL 4806960, at *8 (E.D.N.Y. Sept. 7, 2013) (internal quotation marks and citation omitted), *aff'd sub nom. Spiteri v. Camacho*, 622 Fed. Appx. 9 (2d Cir. 2015). Thus, specific allegations that directly contradict general allegations will generally control. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995). Accordingly, this Court should not consider Plaintiff's conclusory statement that Plaintiff was not paid for six months in

14

2018, which is directly contradicted by statements made by Plaintiff's December 26, 2019 letter which is incorporated by reference in the Complaint.

When Plaintiff's Complaint is considered together with the statements made in the December 26, 2019 letter, Plaintiff has failed to plead a plausible claim for failure to pay minimum wages. As set forth in that letter, Plaintiff was still paid a salary and received profit distributions, albeit allegedly reduced.

Furthermore, although Plaintiff complains that his salary and profit distributions were reduced, Plaintiff has failed to set forth sufficient facts to demonstrate that such amounts ever fell below the minimum wage. Plaintiff has failed to assert specific facts tending to show he was paid below the minimum wage when salary and profit distributions are considered. Notably, as an executive employee, Plaintiff was not required to be paid on a weekly basis. See e.g., NYLL § 191. Accordingly, Plaintiff's general and unspecified allegations of unpaid minimum wages do not comport with the Second Circuit's decisions in *Lundy*, *Nakahata,* and *Dejesus*, and Plaintiff has failed to assert plausible facts that he was paid less than the hourly minimum wage set forth in the FLSA or New York Labor Law.[11]

C.     Plaintiff Is An Employer Pursuant To The FLSA And New York Labor Law And Is Not An Employee For Purposes Of Those Statutes.

The FLSA defines employer as "any person acting directly or indirectly on behalf of an employer." 29 U.S.C. § 203(d). New York Labor Law § 190(3) defines employer as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service." NYLL §190(3). In determining whether an

---

[11]     As Plaintiff's claim for unpaid minimum wages pursuant to the FLSA is Plaintiff's only federal claim, since Plaintiff has withdrawn his FLSA federal claim, the court may dismiss such claim and decline to exercise subject matter jurisdiction over Plaintiff's remaining state law claims and dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1).

individual is an employer pursuant to those statutes, courts use a flexible inquiry based upon a totality of the circumstances. The underlying inquiry in determining "employer" status is whether the individual possessed operational control over employees. *Irizarry v. Catsimatidis* *722 F.3d 99,* 109 (2d Cir. 2013). "A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Id.* at 110. The following factors are often relevant to this inquiry: "[W]hether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984) ). "No one of the four factors standing alone is dispositive." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).[12]

Herein, by the terms of Plaintiff's Complaint, Plaintiff has admitted that he was an employer pursuant to the FLSA and NYLL. Plaintiff asserts he was <u>primarily</u> employed as a general manager and was responsible for overseeing and managing the staff. Marcus Aff., Ex. A, ¶ 20. Implicit in such duties is Plaintiff's ability to hire and fire employees, supervise employees and determine rate and method of payment and maintain records. Again, while Plaintiff asserts that Defendants made derogatory comments about Plaintiff, limited his ability to see financial records and allegedly told other employees not to listen to Plaintiff (*Id.,* ¶¶ 25-29, 42-55), nowhere in his Complaint does Plaintiff set forth that his duties changed. Instead, Plaintiff in his

---

[12]     Courts have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA. *Ho v. Sim Enters. Inc.*, 2014 WL 1998237, at *10 (S.D.N.Y. May 14, 2014) (citing *Moon v. Kwon*, 248 F. Supp.2d 201, 236 n. 17 (S.D.N.Y. 2002). Accordingly, Defendants will analyze both in a similar manner.

Complaint asserts that the night shift manager was terminated in 2019, and he was required to close the store. *Id.*, ¶¶ 47-8. See also Ex. B, p. 2. Plaintiff thus concedes that without a night shift manager or anyone else in charge, he fulfilled such duties. Further, as evidenced by Plaintiff's filing a state claim for an accounting and other remedies pursuant to the NY BCL, Plaintiff has demonstrated that he is an owner of The Airline Restaurant Corp. and is properly classified as an employer. See Marcus Aff., Ex. C.

Defendants submit that Plaintiff cannot serve as both an employer and employee pursuant to both statutes. Otherwise, Plaintiff would be allowed to have a claim against himself. It appears Plaintiff is asserting that somehow he morphed from an employer to an employee (and apparently when the night shift manager left he morphed back into an employer again). Such a conclusion would be unwarranted and improper, especially considering Plaintiff's ownership in the entity during all relevant times. The Supreme Court has cautioned against looking at isolated factors and should look at "circumstances of the whole activity" in reviewing responsibilities. See *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728, 67 S. Ct. 1472, 91 S. Ct. 1473, 91 L. Ed.2d 1772 (1947). Accordingly, Plaintiff's claims pursuant to the FLSA and NYLL should be dismissed.

## POINT III

### PLAINTIFF'S SEVENTH CAUSE OF ACTION FOR NYLL WAGE NOTICE REQUIREMENTS SHOULD BE DISMISSED

Plaintiff's claim for failing to receive a wage notice pursuant to New York Labor Law §195(3) should also be dismissed for the reasons set forth in Point II(C). This statute requires employers to provide employees with notices regarding rates of pay, pay dates, allowances and any other information to employees. It does not set forth a requirement to provide such notices to employers or owners. As an owner-employer, it would make little sense for Plaintiff to be

17

required to give such notice to himself. Accordingly, for the reasons set forth above such cause

of action should be dismissed.

## POINT IV

### PLAINTIFF'S SIXTH CAUSE OF ACTION FOR RETALIATION PURSUANT TO THE NEW YORK LABOR LAW SHOULD BE DISMISSED

N.Y. Labor Law § 215 contains the NYLL's anti-retaliation prohibition. That statute states:

> (a) No employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against **any employee** (i) because such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney general or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter, or any order issued by the commissioner . . . .

N.Y. Labor Law § 215.

As set forth above, the NYLL only applies to employees and does not apply to employers

for the reasons set forth above in Point II(C) above.

Further, Plaintiff's Complaint does not plead that he made any complaints to Defendants

regarding any violations of the New York Labor Law. A plaintiff asserting a claim for retaliation

pursuant to the NYLL must assert a provision of the NYLL about which he complained to set

forth a prima facie claim. See *Grella v. St. Francis Hosp.*, 149 A.D.3d 1046, 1049, 53 N.Y.S.3d

330, 334 (2d Dept. 2017). Plaintiff in his Complaint states that he questioned Defendants about

his reduced wages, lack of profit distributions and lack of access to corporate records. See

Marcus Aff., Ex. A, ¶ 49. Plaintiff also references his December 2019 letter in which his attorney

sought an accounting and complained about a reduction in his salary and wage distributions. See

Ex. B. References to requesting an accounting, reductions in corporate distributions and not

having access to corporate records are not complaints pursuant to the Labor Law but rather

18

implicate the NYBCL and are not actionable pursuant to the NYLL. Although Plaintiff has alleged he complained about reduction of his wages, a reduction of wages by itself is not a violation of the NYLL. Simply put, Plaintiff has failed to articulate any complaint to Defendants of any violation of any section of the NYLL, and this failure is fatal to his claim. See *Grella, supra,* 149 A.D.3d at 1049. Accordingly, Plaintiff's retaliation claim pursuant to the New York Labor Law should be dismissed.

## POINT V

## PLAINTIFF'S THIRD CAUSE OF ACTION FOR AGE DISCRIMINATION PURSUANT TO THE NYSHRL SHOULD BE DISMISSED

Plaintiff's claim pursuant to the NYSHRL should also be dismissed as Plaintiff cannot demonstrate that he was an employee but rather would be categorized as an employer pursuant to that statute. The NYSHRL's definition of employer and employee do not actually provide guidance as to the definitions of those terms. See N.Y. Executive Law § 292 (5) and (6).[13] Accordingly, courts analyzing whether an individual is an employer for purposes of the NYSHRL have analyzed whether the proposed employer: (1) had power of selection and engagement of employee, (2) made payment of salary or wages to employee, (3) had power of dismissal over employee, and (4) had power to control employee's conduct. See e.g., *DiPilato v. 7-Eleven, Inc.,* 662 F. Supp.2d 333 (S.D.N.Y. 2009). Courts have held that the most important factor is whether the claimant had power to control employee's conduct. *Id.* Plaintiff in his Complaint asserts he was primarily employed as a general manager and was responsible for overseeing and managing the staff. Marcus Aff., Ex. A, ¶ 20. Implicit in such duties is Plaintiff's ability to supervise employees and hire and fire employees. While Plaintiff asserts that

---

[13]     The definition of employer pursuant to the NYSHRL merely states that it shall include all employers within the state. See N.Y. Executive Law § 292 (5). Similarly, the definition of employees merely states it does not refer to certain relatives or certain domestic employees. See N.Y. Executive Law § 292 (6).

Defendants made derogatory comments and allegedly told other employees not to listen to Plaintiff (See Marcus Aff., Ex. A, ¶ 25-29, 42-55, 59.), Plaintiff's Complaint does not set forth that his duties changed at any time. Plaintiff asserts that the night shift manager was terminated in 2019, and he was required to close the store. Marcus Aff., Ex. A, ¶¶ 47-8; Ex. B, p. 2. Plaintiff concedes that he would have fulfilled such duties. It would be incongruous for one to be both an employer and employee pursuant to such laws, and the very nature of such claims results in Plaintiff improperly bringing an action against the company in which he is an owner and could be held liable. See e.g., *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (holding those having an ownership interest may be individually liable pursuant to the NYSHRL). Accordingly, Plaintiff's claim for age discrimination pursuant to the NYSHRL should be dismissed.

## POINT VI

### PLAINTIFF'S FOURTH CAUSE OF ACTION FOR AGE DISCRIMINATION PURSUANT TO THE NYCHRL SHOULD BE DISMISSED

Like the NYSHRL, the NYCHRL does not provide a definition of an employer other than a numerosity requirement regarding the number of employees an employer must have for the NYCHRL to be applicable. See N.Y.C. Admin. Code § 8-102(9). However, decisions interpreting such statute have defined employer as those who either "possess ownership interests in the employing company or have discretionary authority to make final personnel decisions." See *Manning v. HealthFirst, LLC*, OATH Index No. 462/05 (Mar. 15, 2006), adopted, Comm'n Dec. (May 10, 2006) annexed hereto as Exhibit 1. Herein, Plaintiff does not dispute he had an ownership interest of Airline Corp. at all relevant times. See Marcus Aff., Ex. A, ¶ 12. Moreover, Plaintiff had authority to make final personnel decisions as supported by Plaintiff's allegation that he was "primarily employed as a general manager, managing the Airline Diner and overseeing and managing its staff." *Id.*, ¶ 20. Further, as the NYSHRL and NYCHRL do not

20

have differing definitions of employer, for the reasons set forth in Point V, Plaintiff is an

employer and cannot avail himself of the NYCHRL.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant its motion

to dismiss the Complaint, along with such other and further relief as the Court deems just and

proper.

Date:   August 17, 2020
        Garden City, New York


                                        Respectfully submitted,

                                        /s_____
                                        Joshua Marcus, Esq.
                                        **FRANKLIN, GRINGER & COHEN, P.C.**
                                        *Attorneys for Defendants*
                                        666 Old Country Road, Suite 202
                                        Garden City, New York 11530
                                        516.228.3131
                                        jmarcus@franklingringer.com


To:     HARALAMPO KASOLAS, ESQ.
        **BRACH EICHLER, LLC**
        101 Eisenhower Parkway
        Roseland, New Jersey 07068-1067
        (973) 228-5700
        bkasolas@bracheichler.com

21

# EXHIBIT 1

### *Comm'n on Human Rights ex rel.*
### *Manning v. HealthFirst, LLC*

OATH Index No. 462/05 (March 15, 2006), *adopted,* Comm'n Dec. (May 10. 2006), **attached**

> Motion to strike respondents' answer denied, but motion was granted to take adverse inferences as a sanction for spoliation of evidence.   Petitioner established employment discrimination based on disability.   Damages awarded included $33,333 for lost income and $10,000 for mental anguish.

---

### NEW YORK CITY OFFICE OF
### ADMINISTRATIVE TRIALS AND HEARINGS

*In the Matter of*
### COMMISSION ON HUMAN RIGHTS
### EX REL KISHANA MANNING
*Petitioner*
*- against -*
### HEALTH FIRST, LLC, JOSEPH CHASSE,
### AND CHERYL BROTHERS
*Respondents*

---

### REPORT AND RECOMMENDATION

**TYNIA D. RICHARD,** *Administrative Law Judge*

In a proceeding brought by the City of New York Commission on Human Rights ("Commission") on the complaint of Kishana Manning, petitioner alleges employment discrimination on the basis of disability, pursuant to sections 8-107(1)(a) and 8-107(15)(a) of the Administrative Code of the City of New York ("Human Rights Law"), against respondents HealthFirst LLC ("HealthFirst"), Joseph Chasse, and Cheryl Brothers.   Petitioner also moves for sanctions against respondents for the spoliation of evidence, seeking to strike the answer or, in the alternative, that an adverse inference be taken for respondents' failure to produce certain evidence.   For the reasons outlined below, I find that HealthFirst's negligent destruction of evidence entitles petitioner to adverse inferences taken for its failure to produce sales reports and complainant's final performance evaluation.   To that extent, petitioner's motion is granted.

The hearing was conducted before me on March 2, 16, and 21, 2005.   Complainant testified on her own behalf.   Four supervisory employees of HealthFirst testified on behalf of

respondents, namely Craig Hauben, Andrea Forino, Cheryl Brothers, and Joseph Chasse. Post-trial memoranda and motion papers were subsequently submitted by the parties.

The complaint filed by the Commission alleges that respondents discriminated against Ms. Manning by terminating her employment because of her disability. In May 2002, Ms. Manning contracted a kidney infection which caused her to take a two-week medical leave, a portion of which she spent hospitalized. On June 28, 2002, less than four weeks after she returned from the leave, she was terminated.

### Individual Liability

Petitioner named Mr. Chasse and Ms. Brothers individually as respondents in this proceeding. Individual employees named as respondents are liable as an "employer" only where they either "possess ownership interests in the employing company or have discretionary authority to make final personnel decisions." *Comm'n on Human Rights ex rel. Rhodes v. Apollo Theatre Investor Group*, OATH Index No. 676/91, at 37 (June 14, 1991), *modified in part*, Comm'n Dec. and Order (Mar. 11, 1992), *modified*, Sup. Ct. N.Y. Co. Index No. 10056/92 (Apr. 20, 1993), *citing Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 544, 483 N.Y.S.2d 659, 661 (1984) and *Nemhauser v. NMU Pension and Welfare Plan*, Dec. and Order, NYCCHR Compl. No. EM00377-7/27/88 (Feb. 22, 1990). There is no evidence in the record to establish the individual liability of Ms. Brothers who was complainant's supervisor, but clearly not a decision maker in her termination. Consequently, this action is dismissed as to her.

Ms. Forino, Director of Human Resources, testified that she made the final decision to terminate Ms. Manning in conjunction with Mr. Chasse, Director of Sales (Tr. 346). Mr. Chasse, influential because of his position as Director of Sales, said that he made recommendations to Human Resources regarding termination but also confirmed that he made the decision to terminate in this case (Tr. 537). I therefore find a sufficient basis for his individual liability as a final decision maker in Ms. Manning's termination.

Having made this finding, the term "respondents" hereinafter will refer to Mr. Chasse and HealthFirst.

## MOTION TO STRIKE THE ANSWER, OR FOR ADVERSE
## INFERENCE, BASED ON SPOLIATION OF EVIDENCE

In a letter dated July 3, 2002, complainant's counsel notified HealthFirst of Ms. Manning's intention to sue the company.  The letter also advised HealthFirst to "preserve from spoliation all documents or other records relating to our client's employment."  *See Letter of Oliver Herzfeld to Andrea Forino*, dated July 3, 2002 (attached to Petitioner's Motion for Sanctions).  Despite this timely notice, the company failed to advise its employees to preserve records related to the litigation of this case (Tr. 290-91).  Craig Hauben, the Vice President of Corporate Services, who created and maintained the computerized sales tracking system, said that he was never advised to preserve information in the database because of Ms. Manning's lawsuit (Tr. 315).  Cheryl Brothers, Ms. Manning's District Sales Manager, testified that, on her own initiative just two weeks before giving testimony, she canvassed her sales reps in an attempt to locate all available sales reports from the relevant time period (Tr. 516, 528, 530).  This search uncovered four sales reports containing results of complainant's performance (Resp. Ex. 25).  Ms. Brothers testified that no one ever asked her to preserve or to search for files concerning this case.  Andrea Forino, Director of Human Resources in 2002, said she did not recall being asked to preserve records for this case (Tr. 416).

The July 3rd letter provided more than ample notice that records relating to Ms. Manning's performance should be preserved in anticipation of this litigation, and the trial record sufficiently established HealthFirst's negligence in failing to preserve such records.[1]

In its motion, petitioner contends that the records that HealthFirst destroyed included certain "key evidence" – specifically, sales reports and a recent performance evaluation – necessary to establish that the actions were a pretext for discrimination.  On that basis, petitioner moves to strike respondents' answer or, in the alternative, that the court make an adverse

---

[1]Petitioner contended that this conduct was negligence, therefore I did not consider whether it contained a higher degree of culpability or intentionality.

Petitioner did not separately notify Mr. Chasse to preserve documents and have not separately alleged or proven any negligence on his part.

inference as to the missing evidence. I find that petitioner is entitled to adverse inferences as to the records that were destroyed.

Spoliation is the destruction of evidence. In New York, the legal basis for spoliation sanctions is well established in the common law, though it is also set forth in section 3126 of the Civil Practice Law and Rules.[2] The doctrine initially was established to prevent the willful destruction of evidence, but eventually was extended to instances where the destruction was attributable to negligence. *See Squitieri v. City of New York,* 248 A.D.2d 201, 203, 669 N.Y.S.2d 589, 590 (1st Dep't 1998) (absence of street sweeper that caused injuries to the plaintiff worked "extreme prejudice" to the case of third-party defendant who was prevented from countering claim of design defect); *Mudge, Rose, Guthrie, Alexander & Ferdon v. Penguin Air Conditioning Corp.,* 221 A.D.2d 243, 633 N.Y.S.2d 493, 494 (1st Dep't 1995) (dismissal warranted because of plaintiff's negligent loss of key piece of evidence that defendants had no opportunity to examine).

The destruction of any evidence is not sufficient grounds to dismiss an action. Under the doctrine, a court is entitled to dismiss the pleadings of the party responsible for spoliation when "a party alters, loses or destroys *key evidence* before it can be examined by the other party's expert." *Squitieri,* 248 A.D.2d at 202, 669 N.Y.S.2d at 590 (emphasis added); *Kirkland v. New York City Housing Auth.,* 236 A.D.2d 170, 173, 666 N.Y.S.2d 609, 611 (1st Dep't 1997) (wrongful death action dismissed where stove was removed and destroyed, making critical inspection of gas connection to stove impossible).

Although dismissal is a severe sanction that precludes adjudication on the merits, "'[t]he stark result [of spoliation] is that relevant evidence was irreparably lost by the actions' of the party basing a claim on that evidence," and "that destruction or loss of evidence should be 'rendered costly enough an enterprise that it will not be undertaken,'" because it leaves the trier of fact with mere speculation as to the sufficiency of the claim. *Kirkland,* 236 A.D.2d at 174, 666 N.Y.S.2d at 612 (citations omitted).

---

[2] Under sections 1-33 and 2-29 of the OATH Rules of Practice, a failure to comply with a discovery order may result in the imposition of sanctions, including the drawing of adverse inferences, dismissal of the case, or declaration of default.

On the other hand, when the evidence destruction "does not deprive the non-responsible party of the means of establishing his or her claim or defense," a less drastic sanction than dismissal of the responsible party's pleading may be imposed. *Marro v. St. Vincent's Hosp.*, 294 A.D.2d 341, 342, 742 N.Y.S.2d 327, 329 (2d Dep't 2002) (negative inference sanction imposed where, although the motorcycle was destroyed, other evidence of accident was available); *see also De Los Santos v. Polanco*, 21 A.D.3d 397, 799 N.Y.S.2d 776, 777 (2d Dep't 2005) (negative inference rather than dismissal of pleading was appropriate spoliation sanction).

Before addressing the motion further, a brief summary of the case is in order.

### *Summary of the Case*

Kishana Manning commenced work for HealthFirst as a marketing representative on November 15, 1999, selling health programs to the public that included Medicaid, Medicare, Child Health Plus, and Family Health Plus (Tr. 12). On or about May 20, 2002, she took ill with a kidney infection, experiencing fever and significant back pain. When her infection worsened, she was admitted to the hospital where she was given intravenous antibiotics (Tr. 54). She returned to work after a two-week medical leave, though she was still under a doctor's care and taking medication for treatment and for pain. She said that the infection left scarring on her kidney, or inflammation, that continues to produce pain (Tr. 183). Although she did not provide the doctor's note to HealthFirst until 10 days after she returned to work, it was not contested that, immediately upon her return to work on June 3, 2002, Ms. Manning requested a reasonable accommodation based upon her doctor's recommendation that she work "light duty" (Tr. 185; Pet. Ex. Q). It is also uncontested that, as an accommodation, her managers assigned her to a work site inside a clinic, a location where she could work without having to physically exert herself.[3]

Ms. Manning testified that during a meeting with her supervisors on June 6, 2002, she was told that she either had to work in her full capacity or go out on disability leave (Tr. 59, 69-70). She said she also was told to work from the company's mobile van to improve her sales yield, which she said she did for the remainder of her tenure at HealthFirst. She said that

---

[3] There can be no claim that complainant failed to notify respondents about her disability, inasmuch as respondents have stipulated that Ms. Brothers acceded to her request for an accommodation (Tr. 476).

working from the van put her in great pain because it required her to walk distances which she did with difficulty.  She complained that she could not perform adequately working from the van.

Respondents denied changing Ms. Manning's assignment from the clinic and contends that she started working at the mobile van without the company's authorization, because she preferred it.

On June 28, 2002, less than four weeks after her return to work, Ms. Manning was terminated from her position.  Respondents contend that the termination was the result of her substandard performance over an extended period of time.   Petitioner contends that this explanation is a pretext for what was actually a discriminatory act, and that her illness and two-week absence from work along with respondents' failure to accommodate her caused the drop in her sales performance in the weeks preceding her termination (Petitioner's Post-Trial Memorandum, at p. 3).

### Key Evidence: Sales Reports and Performance Evaluation

The initial issue to be determined is whether HealthFirst destroyed key evidence that entitles petitioner to a spoliation sanction.

Petitioner maintains that missing sales reports that recorded complainant's performance throughout her tenure at HealthFirst are key evidence that was destroyed.  These reports were generated by the company's computerized sales database and show the monthly sales production of Ms. Manning and other sales reps ("sales reports") (Resp. Ex. 25).[4]  Respondents introduced in evidence only four sales reports: for the months of March, April, May, and June 2002. HealthFirst maintained that it possessed no other sales reports from the time of Ms. Manning's employment, and it produced no monthly sales reports that predated March 2002 and no weekly sales reports.  The two weekly sales reports placed in the record were introduced by petitioner (Tr. 135; Pet. Ex. P; Resp. Ex. 10).

---

[4]HealthFirst produced a spreadsheet containing data taken from the sales database (Resp. Ex. 20) but its witness conceded that the report did not reflect the same information as in 2002 and that the spreadsheet could not explain how successful complainant's sales performance was (Tr. 311, 319-20).

In addition, HealthFirst maintained that it was unable to extract 2002 data from its computerized sales database, because historical sales data were not maintained in the database which updated itself whenever new information was put into the system. HealthFirst also contended that the weekly and monthly sales reports generated by the database were not regularly printed and maintained in files in the ordinary course of its operations, though the latter contention was contradicted by its own witnesses.

Ms. Brothers testified that, in 2002, HealthFirst was in the practice of maintaining files of sales reports and that she had often relied upon the company's files. Her unrebutted testimony was that the sales reports "were always on file at that time if I needed a copy," which she sometimes did because she worked from home and had limited file storage there (Tr. 519-20). Mr. Chasse testified that, each week, the sales reports were emailed to him from the Vice President of Corporate Services, Craig Hauben. Mr. Chasse's administrative assistant copied and distributed them to each sales rep (Tr. 542-43). The reports were then discussed at the weekly sales meetings where reps were made to account for their performance.

HealthFirst provided no explanation for why it made no company-wide demand that employees search their personal files for sales reports, or why it failed to retrieve any of these reports from its email system or computer hard drives. The record presented a more than adequate basis for finding that the company is culpable for destroying evidence relevant to this case after a prompt demand that it be preserved. At a minimum, HealthFirst was negligent for doing so.

Petitioner claims that the missing sales reports are key evidence in its case as they would establish that complainant was performing her job adequately during the period preceding her termination and counter respondents' argument that she was terminated for substandard performance. Furthermore, petitioner contends that she needs access to all sales reports that reflect her performance during her tenure at HealthFirst because respondents claimed to have reviewed her entire employment history in making the termination decision (Petitioner's Post-Trial Memorandum, at p. 8).

8

Respondents dispute that the missing records are key to petitioner's case, stating that nothing in the trial record indicates that every sales report was consulted in the termination decision – only the available personnel file was reviewed.

Key evidence is evidence without which the moving party would be incapable of establishing its case. As is more fully discussed below, there is a significant amount of circumstantial evidence that supports petitioner's contention of discrimination and pretext. I, therefore, did not find the sales reports to be key evidence that justifies striking the answer. Nevertheless, I do find their destruction sufficient to justify a lesser sanction, in this case an adverse inference. *See Marro*, 294 A.D.2d at 342; *De Los Santos*, 21 A.D.2d at 398.

Complainant also claims that her 2002 performance evaluation is key evidence that was destroyed by respondents. As evidence of her good performance, she presented two favorable quarterly performance evaluations for the third and fourth quarters of 2001 (Pet. Exs. A & B), and testified that she received another favorable evaluation in April 2002 (Tr. 160-62). She claimed to be performing well in the six months prior to her termination (Tr. 13). She contends that her April 2002 performance evaluation was the strongest evidence that she was performing satisfactorily at that time, and that respondents failed to produce a copy of it because it was a good evaluation.

HealthFirst failed to prove otherwise. Andrea Forino, former Director of Human Resources, testified that the company had a policy of conducting quarterly performance evaluations and placing them in the employee's personnel file, that a performance evaluation should have been given Ms. Manning in April 2002, and that she looked for one in complainant's file but did not find one (Tr. 351-52, 418-19).[5] Respondents provided no explanation for the absence of the April 2002 performance evaluation. The speculation of respondents' counsel that the evaluation never took place served no evidentiary purpose and could not rebut complainant's

---

[5] Complainant's fourth quarter evaluation for the period October to December 2001, was conducted two months after the quarter ended in February 2002, so one would have expected her evaluation for the period January to March 2002 to have been completed in April or May 2002. Since complainant was not terminated until June 28th, there appeared to be no reason why she was not evaluated before then – particularly in light of respondents' purported concern about her performance.

testimony.   In the absence of evidence that Ms. Manning's evaluation did not take place, I credited complainant's testimony that it did.

Since the 2002 evaluation was not the only evidence available to support petitioner's case, its destruction did not supply a basis for striking the answer.   Nevertheless, the 2002 performance evaluation was important, particularly because of its proximity in time to the termination decision.   I find therefore that respondent's failure to produce it entitles petitioner to the adverse inference that the missing evaluation was favorable to complainant, as were her earlier evaluations.

The facts of this case will be analyzed in the context of these two adverse inferences.

## POST-TRIAL ANALYSIS OF THE FACTS

### Prima Facie Case

A plaintiff alleging discrimination based upon disability has the initial burden to establish a *prima facie* case of discrimination.   Petitioner's lawsuit alleges that complainant was discriminated against on the basis of her disability, in violation of the New York City Administrative Code, known as the "Human Rights Law."   *See* Admin. Code §§ 8-107 (1)(a) and 8-107 (15)(a).[6]

Petitioner may establish a *prima facie* case of discrimination on the basis of her disability if she shows that: (1) she was disabled, (2) she was terminated, (3) she was qualified for the position, and (4) her termination gave rise to an inference of discrimination.   *Grullon v. South Bronx Overall Economic Dev. Corp.*, 185 Misc.2d 645, 648, 712 N.Y.S.2d 911, 914 (Civ. Ct. N.Y. Co. 2000); *see Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305, 786 N.Y.S.2d 382, 390 (2004).   Under the *McDonnell Douglas* analysis, discriminatory intent is presumed once petitioner establishes a *prima facie* case, and the burden shifts to respondents "to rebut the

---

[6] Section 8-107 (1)(a) prohibits an employer, or an employee or agent thereof, from discharging any person from employment or from "discriminat[ing] against such person in compensation or in terms, conditions or privileges of employment" because of his or her disability.

Section 8-107 (15)(a) requires that employers "shall make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the [employer]."   It shall be an affirmative defense, with the burden upon the employer, to show that "the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, satisfy the essential requisites of the job or enjoy the right or rights in question."   Admin. Code § 8-107 (15)(b).

presumption of discrimination by clearly setting forth, through the introduction of admissible evidence, legitimate, independent, and nondiscriminatory reasons to support its employment decision." *Forrest*, 3 N.Y.3d at 305, 786 N.Y.S.2d at 391; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 1824 (1973). In order to then succeed on its claim, petitioner must show that the legitimate reasons offered by respondents were merely a pretext for discrimination, by demonstrating both that the stated reasons were false and that discrimination was the real reason. *Forrest*, 3 N.Y.3d at 305, 786 N.Y.S.2d at 391.

I find that petitioner established its *prima facie* case.

The meaning of "disability" under the city Human Rights Law is broader than it is under state or federal law. *See Grullon*, 185 Misc.2d at 653-54, 712 N.Y.S.2d at 918. The Administrative Code defines disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." Admin. Code § 8-102 (16)(a). The term "physical, medical, mental, or psychological impairment" means, among other things, "an impairment of any system of the body." Admin. Code § 8-102 (16)(b)(1). Ms. Manning suffered from a kidney infection that required hospitalization and caused her to miss two weeks of work, necessitated ongoing medication for the illness and for pain management, and caused her doctor to recommend that she be assigned to light duty upon her return to work (Pet. Exs. S, CC & DD). Movement caused her additional pain. According to the medical records, complainant suffered from acute pyelonephritis, a urological illness; Ms. Manning testified that the illness first presented when she was 14 years old and has recurred several times since then (Tr. 242-43). Even after her termination, complainant continued to suffer pain, and at the time of trial, she was still taking antibiotics daily for a recurrence of the illness. This record is sufficient to show that complainant had a disability under the city Human Rights Law, which consisted of an illness of her kidneys, a part of the urinary system of the body, which caused pain and hindered her mobility.

There is no dispute that complainant was terminated from her position at HealthFirst, thus establishing the second element of the *prima facie* case.

Petitioner must also show that complainant was qualified for the position she held at HealthFirst. Petitioner's burden on a *prima facie* case is not nearly as high as respondents assert

in their brief. What is required to be established in this element "is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001); *see Taylor v. Local 32E SEIU*, 286 F. Supp. 2d 246, 252 (S.D.N.Y. 2003). Here, petitioner need only show "that she possesses the basic skills necessary for performance of the job." *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991) (citations omitted). Ms. Manning offered credible evidence that she possessed the necessary skills to be eligible for her position, as evidenced by her favorable performance evaluations and her continued employment as a sales representative at HealthFirst for more than two and a half years. *See Ramos v. Marriott Int'l*, 134 F. Supp. 2d 328, 338 (S.D.N.Y. 2001); *Cruse v. G & J United States Publ'g*, 96 F. Supp. 2d 320, 328 (S.D.N.Y. 2000). I find that petitioner established this element by a preponderance of the evidence.

The fourth element to be established is that complainant's termination gave rise to an inference of discrimination. I find that it did. Respondents claim that complainant was a marginal employee for the duration of her two-and-a-half-year employment at HealthFirst; yet, the decision to terminate her came just weeks after she returned from a medical leave with an illness that required respondents to afford her a light duty accommodation. I find an inference of discrimination established by the closeness in time between Ms. Manning's request for the accommodation and her termination. *See Lovejoy-Wilson v. Noco Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001) (causal connection "can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."); *Conley v. UPS*, 88 F. Supp. 2d 16, 21 (E.D.N.Y. 2000) (causal connection can be shown by protected activity that is closely followed in time by adverse treatment, thus satisfying element of *prima facie* case in retaliation claim).

Under traditional burden-shifting analysis, after petitioner establishes its *prima facie* case, the burden shifts to respondents to provide a legitimate, independent, and non-discriminatory reason for their employment decision. This burden "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000).

*The Decision to Terminate*

Respondents contend that the decision to fire Ms. Manning was motivated by her poor sales performance. Joseph Chasse, HealthFirst's Vice President for Sales, was the principal actor in the decision to terminate, though other of complainant's supervisors also participated. Mr. Chasse testified about his belief that Ms. Manning was good at "playing the system" (Tr. 536), which in his assessment meant performing the minimum amount of work to keep her job. She would "hit goal for two weeks, not do it for two weeks, not [hit] goal for three weeks, then maybe do it for two weeks. And this went on and on over a period of time" (Tr. 537). He testified that, in deciding whether to terminate her, he considered "everything":

> [W]hen I did decide . . . to terminate her, I looked over her history, not just the last three months and I looked at her ability to follow directions, her response to her managers, the complaints. I looked at her attendance. . . . I looked over everything. I didn't just look at the last couple of months that she worked (Tr. 537).

Mr. Chasse said that, in addition to using his general knowledge of Ms. Manning's performance, he reviewed her personnel file at the time that he decided to terminate her. Although the testimony above suggests that in reviewing her file he found many negatives in Ms. Manning's job performance, he detailed few of them outside of this testimony. Besides her sales performance, he said that he considered that she did not get along with her supervisors (Tr. 539). When challenged about this statement, in light of two performance evaluations in which she scored a 4 and a 5, out of a possible 5, in the category of "collaboration," Mr. Chasse stated that an inability to get along with supervisors would not be addressed in her evaluations, rather it would be documented in a separate memo (Tr. 568). He pointed to no such memo, however.

Mr. Chasse also later contradicted his statement that he reviewed "everything." When asked whether he reviewed the sales data that supported a June 24, 2002, memo written by one of Ms. Manning's former supervisors, he qualified his answer and admitted that he did not recall reviewing the documentation himself: "I had already had countless meetings and conversations regarding her performance as a whole. . . . I didn't have to start looking at every piece of paper to make that decision. All I had to do was make that decision" (Tr. 549). The question in this

case is what motivated that decision.  Mr. Chasse and Ms. Brothers both testified that it was complainant's failures to meet her sales goals.

As evidence of Ms. Manning's poor performance, respondents produced the four monthly reports from March to June 2002.  Although these reports were not in her personnel file, Mr. Chasse said that he had knowledge of them.  They show the percentage of her sales goal that Ms. Manning achieved during the last four months of her tenure at HealthFirst:

> 25% of goal – month ending March 28;
> 143% of goal – month ending April 26;
> 51% of goal – month ending May 28; and
> 49% of goal – month ending July 3.

These monthly reports did not measure sales according to the calendar month; rather, they recorded sales based on a time period established according to the product line, which was approximately monthly.  According to respondents, Ms. Manning did poorly in March, May, and June, though she had a strong performance in April.

Also contained in complainant's personnel file were a number of "substandard performance" memos written by her supervisors that tracked her failure to meet 100% of her sales goal on a weekly basis (Resp. Ex. 26).  Respondents contend that these memos are further evidence of poor performance.

Complainant's personnel file contained a January 2002 memo that pointed out her failure to regularly meet her sales goals, documented a plan for her to follow to improve her sales, and required her to meet goal over the next four weeks (Pet. Ex. C).  Respondents called this memo a "Performance Improvement Plan" ("PIP") and said it was essentially a warning that complainant could be fired at any time if she failed to meet its requirements.

On June 6, 2002, Ms. Manning met with her supervisors who complained that her sales results were unsatisfactory.  Ms. Brothers wrote a memo documenting the meeting and complainant's failure to meet the requirements of her Performance Improvement Plan (Resp. Ex. 26).

On June 24, 2002, days before complainant's termination, her former supervisor Mercy Jimenez wrote a memo recommending her termination (Resp. Ex. 26).  The memo, which states

that complainant had been on a Performance Improvement Plan since January, reports that she had not achieved goal since April and had the following sales results:

> 53% of goal – month of February
> 25% of goal – month of March
> 143% of goal – month of April
> 51% of goal – month of May
> 53% of goal – month of June.

This evidence was sufficient to satisfy respondents' burden of providing a legitimate, independent, and non-discriminatory reason for firing complainant.

### Pretext

After respondents provide a legitimate, independent and non-discriminatory reason for the adverse action, to succeed on its claim, petitioner "must prove that the legitimate reasons proffered by the defendant were merely a pretext for discrimination by demonstrating both that the stated reasons were false and that discrimination was the real reason." *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d at 305, 786 N.Y.S.2d at 391. To establish pretext, petitioner may demonstrate "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action." *Cruse v. G & J United States Publ'g*, 96 F. Supp. 2d at 329. Petitioner may do so with the use of direct or circumstantial evidence. *Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714, n.3, 103 S. Ct. 1478, 1481 (1983).

The utility of circumstantial evidence in discrimination cases has already been established. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100, 123 S. Ct. 2148, 2154 (2003). That is, the fact finder is free to find not only that "defendant's explanation is unworthy of credence," but also that the "falsity of the . . . explanation" is "probative of intentional discrimination" or at least evinces an intent on the part of the defendant to "cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147, 120 S. Ct. at 2108.

Among other things, I used the three primary means of assessing Ms. Manning's work performance – the monthly sales reports, substandard performance memos, and her performance evaluations – to assess whether petitioner established that respondents' reasons for her termination were pretextual.

Sales Reports

Because of the adverse inference applied to the missing sales reports, all sales reports that precede March 2002, are entitled to an inference that complainant met her sales goals.

Of the four monthly reports that were produced, two months were negatively affected by complainant's absence from May 20 through June 2 due to her illness and, likely, reduced performance caused by her illness after she returned. The results for the month of June, calculated through July 3rd, were also affected by her June 28th termination. If Ms. Manning's results were adjusted to account for these absences, she would have been closer to making goal in both months, *i.e.*, approximately 75% of goal in both months. Mr. Hauben testified that sales goals were adjusted downward to account for holidays that intervened in the reporting period; he did not indicate what effect sick leave had on the calculation (Tr. 303-04).

Substandard Performance Memos

As previously noted, complainant's personnel file contained a number of memoranda that report her failure to reach monthly sales goals, *i.e.*, "substandard performance" memos (Resp. Ex. 26). According to respondents, these memos were drafted by supervisors after they reviewed a sales rep's performance, either by counting the number of applications that he or she submitted for the week, or by reviewing the weekly and monthly sales reports (Tr. 541-42).

The substandard performance memos are essentially forms which state as follows:

> For the week of [date] to [date], despite extensive coaching and counseling, your job performance was below minimal acceptable standards of performance. No discernible improvements have been made in the critical skills areas.

They do not report how close a sales rep was to reaching the sales goal. Nor do they contain a qualitative evaluation of the employee's work performance. According to Mr. Chasse, the only way to ensure that these memos were accurate was to consult the sales reports, which in this case were unavailable. Although sales reps were not told when a substandard performance memo was placed in their files, Ms. Brothers said that she informed her sales reps about the practice during orientation so she was confident that they knew she was documenting them (Tr. 524-25).

Because of the adverse inference applied to the missing sales reports, petitioner is entitled to use them to contradict any substandard performance memos written prior to March 2002. Aside from the adverse inference, however, several other factors led me to find these memos either unreliable or of questionable validity.

First, it was not established that these memos always reported "substandard" performance. Mr. Hauben testified that at the time of trial approximately 60% of the sales reps performed below goal in an average week: 25% of sales reps landed between 80 and 100% of their goal, which was referred to as "the sweet spot" (35% achieved below 80% of goal) (Tr. 311-12). Reps that scored in the sweet spot also received substandard performance memos, even though this level of sales production was not considered by management to be substandard (Tr. 507). Since the substandard performance memos do not note the percentage of sales achieved, there is no way of knowing whether Ms. Manning received them when she was in the 80 to 100% range.

Second, the fact that 10 such memos were in Ms. Manning's file for the period October to December 2001, was inconsistent with the above average performance evaluation she received for that period. The conflict between the two evaluative tools further undermined the value of the memos, since it was impossible to credit them over the performance evaluations which are a more substantive and credible means of assessing performance and employee effectiveness. *See Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S. Ct. 91 (1985) (courts may rely upon the evaluations rendered by supervisors in determining whether an employee's job performance is satisfactory).

Third, the substandard performance memos proved to be less than reliable reflections of the sales data when some were shown to contradict sales reports that indicated that complainant had met goal. While substandard performance memos claimed that Ms. Manning failed to meet goal for the four weeks from April 8 through May 3, 2002, including the week ending April 19th, complainant also received certificates of achievement for exceeding goal the week of April 19th and for the entire month of April (Pet. Exs. J & K). This discrepancy was never satisfactorily

explained (Resp. Ex. 26).[7]  When questioned about the contradiction, Mr. Chasse, who signed all achievement certificates before they were issued, simply credited the memos over the certificates (Tr. 543-44).  His failure to provide a logical explanation for the discrepancy, given that both the memos and certificates should have been generated by the same sales data, reflected negatively on his credibility.

Overall, I found that the substandard performance memos lacked credibility as a tool for assessing Ms. Manning's performance and concluded that they were unreliable evidence of her failure to perform.

The June 6th Meeting

Ms. Brothers testified that she called a meeting on June 6, 2002, to discuss Ms. Manning's poor performance, just days after her return from medical leave (Tr. 493-94).  The meeting was also attended by Mr. Chasse who she said was there to observe.  Ms. Manning had no prior warning of the meeting; they met at her day's work assignment.  Ms. Brothers wrote a memo that memorialized the meeting and noted that complainant had failed to meet the goals of her Performance Improvement Plan ("PIP").  Ms. Manning, who refused to sign the memo, in protest, and denied that she was ever on a PIP, considered the memo a "form" document that did not reflect the expectations of her position because requirements such as "opening additional sites" were not applicable to reps who worked from the van, as she did (Tr. 66-68).  She also noted that one of the enumerated failures listed in the memo mistakenly referred to her with the male article "his" and was further evidence that it was a form.

Ms. Manning said that, at the meeting, her supervisors complained that her sales were lagging and she had to improve them; she said she protested that she had just returned from leave and was still in pain (Tr. 59).  Mr. Chasse, who had just returned from vacation, was unsympathetic to her request for a light duty accommodation, stating that "there's no such thing as light duty here . . . . You either go out on disability, collect an unemployment check or you

---

[7]Mr. Chasse explained that it was possible that an employee might receive substandard performance memos for the first three weeks of a month and then rally to meet her monthly goal by selling vigorously in the final week of the month (Tr. 545).  While this could explain complainant's substandard performance memos for the first three weeks of April, it does not explain the one for the week of April 19th nor does it diminish the fact that complainant ultimately exceeded her goal for the month of April and was entitled to recognition for it.

return to your full capabilities of doing this job." She interpreted this as a withdrawal of the accommodation previously granted to her by Ms. Brothers. Since she had previously been assigned to the mobile van, complainant also took this as an instruction to return to the van. Working from the van, however, was more difficult for her because it required walking an area within a two-block radius of the van to attract potential clients, and walking gave her back pain (Tr. 69).

Mr. Chasse said that he spoke very little at the meeting, if at all (Tr. 547). He did not recall what he said, but he denied telling Ms. Manning to return to the van. Mr. Chasse confirmed that reps were to work the territory outside the van to "drive" traffic to the van (Tr. 562). He said he thought that Ms. Manning got what she wanted from the meeting.

Ms. Brothers said that she emphasized at the meeting that, now that Ms. Manning was back from leave, she had to make sure that she was achieving her sales goals (Tr. 497). Ms. Manning told her she had just returned from medical leave, and that customer traffic at her clinic assignment was "dead." Ms. Brothers said she told Ms. Manning that she had to stay at that clinic assignment, even if it was dead. Ms. Manning objected, saying that she was "supposed to be accommodated," and Mr. Chasse told her she was being accommodated (Tr. 498). Mr. Chasse said the clinic should have had 100 to 150 people entering it daily (Tr. 546).

As if to explain why she called this meeting so soon after Ms. Manning's return from medical leave, Ms. Brothers testified that she had planned to meet with Ms. Manning to discuss her performance prior to her medical leave (Tr. 493-94). When asked why she would have planned such a meeting in May when Ms. Manning had made 143% of goal in April (Resp. Ex. 25) and 100% of goal for at least one week in May (Pet. Exs. P & O), Ms. Brothers first said it was because of Ms. Manning's substandard performance during the final week of April (Tr. 508); later, she said it was because of her poor performance in the weeks preceding April when Ms. Manning was reporting to another manager (Tr. 514-16). Ms. Brothers' testimony contradicts her own documentation of the meeting, however, which states that the meeting was to review the "past eight weeks" of Ms. Manning's performance (Pet. Ex. T). Those eight weeks included the two weeks of Manning's absence, the previous three weeks of May (at least one of which was successful), and the month of April (which also was successful).

Under the circumstances, I discounted Ms. Brothers' explanation for holding the meeting finding it unworthy of belief.

Memos Tracking Performance Improvement

According to respondent, supervisors met with Ms. Manning on January 10, 2002, to warn her about her failing performance and to give her a Performance Improvement Plan, which outlined specific performance requirements to avert termination (Tr. 557). According to the January 15th memo memorializing that meeting (Pet. Ex. C), Ms. Manning had to achieve 100% of her goal for the following four weeks, open two sites per week, and submit a weekly schedule, project sales activities, and study and utilize the Sandler Sales System. The memo states that her performance would be monitored weekly and, if no improvement was made, her position would be "re-evaluated." It was unclear to what extent this meant "termination"; the memo did not state that it was a Performance Improvement Plan.

Ms. Manning said that she met that day with Mr. Chasse and Ms. Jimenez, her supervisor, and was shown the memo, though she was not given a copy (Tr. 19). She said the meeting was held because she was not meeting her Medicare goal, that it ended with an agreement to eliminate her Medicare goal, and it did not include discussion of many of the points listed in the memo (Tr. 20-21). She denied ever being placed on a PIP and she disputed that this document was a PIP, which normally carried a threat of termination (Tr. 47, 123, 238).

To the contrary, Mr. Chasse maintained that Ms. Manning was being monitored under this so called PIP at the time of her termination. He said that a PIP put an employee on notice that he or she could be terminated at any time ("You can go just like that") (Tr. 579). Once a PIP was created, he said, a sales rep stayed on it "forever": that is, if she met goal for two months and missed goal in the third month, she would still be subject to the PIP (Tr. 558). Even if complainant had done well during the four-week monitoring period, he said, the company would have continued to monitor her thereafter. Curiously, he stated that if Ms. Manning had met goal during two of the four weeks following the memo, she would still have her job; yet, he provided no evidence that she failed to make goal for any part of the period (Tr. 550).

In fact, there is no evidence that complainant's performance was monitored over the four-week monitoring period indicated in the memo. There are no memos from January or February

documenting her progress or indicating whether she made goal; there are no substandard performance memos for the period. The only indicator of her performance in the four weeks after the January 15 memo is positive: a certificate of excellence issued to her for the week ending January 18, 2002, the first week of the monitoring period (Pet. Ex. M). It is not clear whether this certificate indicates that she made goal for the week.

It should be noted that the January 15th memo bears a strong resemblance to two similar memos written in 2001, both of which required that complainant meet 100% of sales in the month that followed and state that "failure to meet these requirements over the next thirty days could lead to further corrective action" (Resp. Exs. 8 & 9). Ms. Manning said that no corrective action was ever taken (Tr. 114). She said these memos were not Performance Improvement Plans; rather, they were a first step that preceded a PIP. Because she was familiar with a PIP issued to a co-worker, she said that they usually had a term of three months, not 30 days (Tr. 121, 237-38). She reasoned that the absence of a true PIP in her file indicated that she had subsequently met her requirements. She claimed that these were the only three instances of counseling for poor sales performance in her two and a half years at HealthFirst (Tr. 139).

There were several reasons why I was skeptical of the company's claim that the January 15th memo was directly related to the company's decision to terminate complainant. First, if it were a document that reflected a "last chance" to maintain her position with the company, it could have more clearly stated that, either by calling itself a Performance Improvement Plan or by stating that termination would result for a failure to fulfill its requirements.

Second, contrary to Mr. Chasse's testimony, there was no evidence that the memo's requirements were ever monitored, which suggests either that it was not a serious warning, or that complainant complied.

Third, the only "monitoring" that did occur happened after complainant became ill and sought an accommodation.[8] The June 6 and June 24 memos were the only documents in complainant's personnel file that referred to the January 15th memo as a PIP, and they both were written after complainant's request for accommodation (Resp. Ex. 26). The June 24th memo,

---

[8]Ms. Manning testified that she had never seen the substandard performance memos that were placed in her file for the months of April and May 2002, some of which were erroneous (Tr. 37-42).

which complainant had never seen and was not even written by her direct supervisor, seemed conspicuously written for the purpose of justifying the decision to terminate her (Tr. 44-45). It mentioned not one word about Ms. Manning's illness, her medical leave (a two-week absence that certainly would have affected her sales production), or the fact that she had been granted a light duty accommodation during the period of review.

Fourth, the standards for retention of employment under a PIP were nebulous and seemingly impossible to satisfy; according to Mr. Chasse, a sales rep could complete all of its requirements and still remain under its threat.

Performance Evaluations

The most favorable record of complainant's performance was contained in her performance evaluations which were quite positive. Ms. Manning said that the quarterly evaluations were the basis for receiving merit increases, and that she received $5,000 and $10,000 bonuses upon completing her first and second years with the company (Tr. 131, 238-39). There was a high turnover of sales reps at HealthFirst and, by comparison, she had a lengthy tenure there.

In her last documented performance evaluation, for the period October through December 2001 (Pet. Ex. B), Ms. Manning received an average score of 4 out of a possible 5.[9]  The language employed in the evaluation suggests that a score of 3 is average ("has an average pace") and a score of 4 is above average ("exceed[s] performance requirements"). Thus, the evaluation indicates that Ms. Manning was a good or above average performer. Her performance

---

[9] Complainant scored 3 out of 5 for "Quantity of Work," which indicates that she "completes tasks required within required timeframes and meets department goals with an average workload." For "Quality of Work," she was given 5 out of 5, which indicates that her "quality of work is outstanding and always exceeds expectations. Continually adheres to company processes and acts as a resource for others in the department on quality issues." In the area of "Collaboration," she received 4 out of 5, which indicates that she "cooperates and proactively contributes to positive working relationships within [her] own department and other departments. Promotes a free, open exchange of ideas by attempting to see the value of others' ideas and suggestions." For "Time Management," she received 3 out of 5, which means that she "completes assigned tasks within allotted timeframe or within deadlines, most often. Demonstrates ability to prioritize and handle most critical assignments first. Has an average pace; no particular sense of urgency." She received 4 out of 5 for "Job Knowledge," which indicates that she "utilizes knowledge of position to exceed performance requirements" and "quickly adapts to changing environments." For written and verbal "Communication Skills," she received 4 out of 5, which indicates that she "demonstrates professionalism, adapting communication style in a number of situations."

evaluation for the period July to September 2001, was slightly better, also averaging a score of 4 out of 5 (Pet. Ex. A).

As noted above, petitioner is entitled to an inference that complainant's first quarter 2002 evaluation is at least as favorable as her prior evaluations. Therefore, Ms. Manning is entitled to the inference that, as recently as April 2002, she received another above average performance evaluation. It is unlikely that the company would give an above average evaluation to an employee who was about to be fired for substandard performance. *Cf. Stein v. McGraw-Hill, Inc.*, 782 F. Supp. 207, 212-13 (S.D.N.Y. 1992) (poor performance evaluations allow court to draw inference that reason for termination was quality of work, and not unlawful discrimination).

I noted that complainant's performance evaluations differed markedly from her supervisors' testimony about her performance – a difference her supervisors were unable to explain. Since performance evaluations are purposed to assimilate a variety of information to provide a qualitative assessment of work performance, I credited them over other less substantive memoranda in complainant's file. *See Meiri*, 759 F.2d at 995. I also viewed the conflicting testimony of Ms. Manning's supervisors as probative of an intent to cover up a discriminatory purpose.

Respondents contend that complainant was fired because she was consistently a poor performer but failed to prove it.[10] Mr. Chasse first testified that he reviewed all of Ms. Manning's performance records in making the decision to terminate, but later contradicted himself. The sales reports were missing and therefore presumed favorable to her; her performance evaluations, most recently performed in April 2002, were favorable to complainant; and the substandard performance memos were not credible enough to establish that she was a poor performer. Though Ms. Manning's sales in the months preceding her termination were a mixture of success and failure, part of the failure was attributable to her absence while on medical leave and need for accommodation after she returned.

---

[10]HealthFirst established no clear standard for terminating its sales reps for low sales performance. In fact, it admitted that 60% of sales reps failed to make goal each week and the average employee achieved only 85% of goal (Tr. 325). Consider that, during the week of May 14, 2002, complainant and only two co-workers on her nine-member sales team achieved goal (Pet. Ex. P); during the week of June 18, 2002, only one person on the team met goal (Resp. Ex. 10). There was no evidence of Ms. Manning's percentage of achievement over her tenure at HealthFirst, nor evidence that her performance was below that of her co-workers.

Moreover, the evidence did not establish that Ms. Manning was fired because she failed to comply with a Performance Improvement Plan. It was never established that the January 15th memo was a Performance Improvement Plan that carried an implicit threat of termination; this so called "plan" was never monitored; and the only evidence that complainant's termination flowed from it was generated after she requested an accommodation, and thus was discredited. To further confuse matters, Mr. Chasse stated that, had she met goal for two of the four weeks after the January memo, she would still have her job at HealthFirst. This was curious because there was no evidence that she failed to make goal for two of the four weeks, and it also contradicted his claim that it was her record of failures over time that led to her termination.

The causal connection necessary to establish a claim of discrimination "can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Lovejoy-Wilson v. Noco Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001). The June 6th meeting set the stage for complainant's termination, and its timing supported an inference of retaliation. *See Conley v. UPS*, 88 F. Supp. 2d at 21 (increased supervision may constitute an adverse action for purposes of retaliation claim). The meeting was held just three days after Ms. Manning returned from medical leave and requested the light duty accommodation. *See Lyman v. City of New York*, 2003 U.S. Dist. LEXIS 16471, *26 (S.D.N.Y. 2003) (requests for accommodation are a protected activity that raise an inference of retaliation when occurring close in time with an adverse employment action). Many courts have drawn such inferences on the basis of timing. *See, e.g., id.* (four-month period between the first request for accommodation and negative employment evaluation); *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001) (14 months elapsed between filing of EEOC complaint and termination); *Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 319 (S.D.N.Y. 2002) (six-month period between filing of EEOC complaint and termination); *Vernon v. Port Authority of NY and NJ*, 154 F. Supp. 2d 844, 859 (S.D.N.Y. 2001) (four-month period between start of Port Authority EEO investigation and plaintiff's performance downgrade). Here, complainant was terminated less than a month after her request for accommodation.

The inference was not rebutted by Ms. Brothers' and Mr. Chasse's denials and explanations. For example, Ms. Brothers' explanation for holding the June 6th meeting was unconvincing. Her memo claimed that the meeting was to discuss the prior eight weeks'

performance, yet she could not deny that complainant had performed well for five of those weeks and was absent for two other weeks – hardly a reason for such a meeting. Also, Ms. Brothers claimed that she pressed Ms. Manning to remain in the clinic despite her complaint that she was not making sales there was not believable given the fact that the purpose of the meeting was to warn complainant about low sales. Rather, this claim seemed calculated to bolster Ms. Brothers' contention that she did not deny complainant the accommodation she requested. I concluded that the June 6th meeting, and subsequent memos written about Ms. Manning's performance, evidenced a stepped-up monitoring of her which set the stage for her improper termination less than four weeks later.

The contradictions and implausibilities contained in respondents' justification for terminating Ms. Manning led me to conclude that her sales performance was not the actual reason for her termination. *See Reeves*, 530 U.S. at 147, 120 S. Ct. at 2108 (false explanations offered by respondent are "probative of intentional discrimination"). Rather, she was terminated because she sought an accommodation that the company was unwilling to provide – an accommodation to which she was entitled because of her disability.

The Human Rights Law requires that employers provide a reasonable accommodation "to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question." Admin. Code § 8-107 (15)(a). Respondents failed to provide Ms. Manning with an accommodation.

Ms. Manning testified that Ms. Brothers initially honored her request for light duty but later withdrew it at the June 6th meeting, where Mr. Chasse told her that there was no "light duty" – either she pulled her weight or she went out on leave. Although Ms. Manning had her own credibility problems,[11] I credited her testimony over Mr. Chasse's denial which, being

---

[11]Respondents argue that complainant is not credible, citing discrepancies between her deposition and trial testimony in connection with her marital and tax filing status (Respondents' Post-Trial Memorandum, at 10). Ms. Manning testified at her deposition that she lived continuously with her husband from 1999 to 2004, but at trial admitted that they did not live together continuously during that period because they had periods of separation (Tr. 201-02). They were separated at the time of her termination (Tr. 210). Respondent contended that these and other seeming discrepancies were to cover up false statements in her tax filings. Though the matters raised regarding complainant's support of her great-grandmother, custodial arrangement for her son, and periods of separation from her husband created some discrepancies, they did not lead me to make a finding that she filed false tax returns, as respondents request, or to discredit her testimony in its entirety.

crucial to respondents' case, was at least as self-interested as Ms. Manning's accusation. Moreover, his statement was consistent with the objective of the meeting which was to increase her sales production. While I did not believe that Mr. Chasse gave her an explicit order to work in the van, the clear message was that she had to improve her performance. I found it likely that she went to the van because, as she indicated, she was more successful selling from the van and she was being pressured to produce sales (Tr. 149, 218-19, 222). Even though her supervisors knew she had started to work from the van, they never told her to return to the clinic, which suggested they approved of the switch.

The rejection of complainant's request for light duty was a rejection of a reasonable accommodation, which at a minimum triggered respondent's obligation to discuss with her what she needed and to offer another reasonable accommodation, and that never occurred. The employer has a duty to engage in an "interactive process" with the employee by which they decide upon an appropriate accommodation based on the employee's limitations. *See Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000); *Felix v. N.Y. City Transit Auth.*, 154 F. Supp. 2d 640, 658 (S.D.N.Y. 2001), *aff'd*, 324 F.3d 102 (2d Cir. 2003); *Human Resources Admin. v. Varone*, OATH Index No. 695/01, at 11 (Dec. 26, 2001). In the absence of providing a reasonable accommodation, the employer must demonstrate that making the proposed accommodation would result in "undue hardship," and no showing of hardship was made here. *See Torres v. Prince Management Corp.*, OATH Index No. 301/98, at 12 (Aug. 14, 1997), *aff'd*, Comm'n Dec. (Oct. 27, 1997), *aff'd*, NYLJ, July 29, 1998, at 22, col. 5 (Sup. Ct. N.Y. Co.).

Instead of engaging in a good faith interactive process to identify an appropriate accommodation, HealthFirst maintained rigid sales expectations and increased its monitoring of Ms. Manning after she requested an accommodation. Complainant's doctor's note simply stated "light duty until notified" (Pet. Ex. Q). Implicit in the term "light duty" is the premise that her normal sales activity was too strenuous for her physical limitations. *See Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 677 (7th Cir. 1998) *cited in Pimentel v. City of New York*, 2001 U.S. Dist. LEXIS 20426, at * 48 (S.D.N.Y. 2001), *rev'd on other grounds*, 2002 U.S. Dist. LEXIS 8454 (S.D.N.Y. 2002), *aff'd*, 2003 U.S. App. LEXIS 18863 (2d Cir. 2003) ("[T]he option of reassignment is particularly important when the employee is unable to perform the essential

functions of his or her job . . . ." ).  It was therefore incumbent upon respondents to find a work assignment that took her physical limitations into account.   As an affirmative defense, respondents may show that complainant was unable to satisfy the "essential requisites" of the job even when provided with the accommodation, but they did not do so, having failed to prove that Ms. Manning was performing inadequately.  *See* Admin. Code 8-107 (15)(b) (employer's burden to establish affirmative defense that employee was unable to satisfy the "essential requisites" of the job even with reasonable accommodation).  To the extent that a "light duty" accommodation may have required respondents to tolerate reduced sales productivity, that would be appropriate here where respondents have not demonstrated that achievement of 100% of goal was an "essential requisite" of the job, that is, a standard required each month by all employees (*see infra* note 10).  In addition, there was no testimony about how long the light duty might be necessary; nor was there any allegation that complainant sought a light duty assignment of unlimited duration, which might be unreasonable if it permanently altered her job responsibilities in significant ways.  *Cf. Stone v. City of Mt. Vernon*, 118 F.3d 92 (2d Cir. 1997) (light duty assignment may constitute a reasonable accommodation, citing 42 U.S.C. § 12111(8) of the Americans with Disabilities Act ("ADA")); *Dep't of Correction v. Noriega-Harvey*, OATH Index No. 1250/97 (Aug. 14, 1997) (permanent light duty is not a reasonable accommodation under the ADA).  In the absence of any evidence of a burden, I find that accommodating Ms. Manning with a temporary light duty assignment that relaxed her sales production requirements and accommodated her physical limitations was reasonable under the Human Rights Law.

This tribunal concludes that respondents failed in their obligations under the Human Rights Law, where they failed to engage in an interactive process, offered an accommodation but then withdrew it, failed to offer an alternative accommodation, and failed to establish that providing a reasonable accommodation was an undue burden.

The evidence suggested that HealthFirst managers were unaware of their obligation to accommodate Ms. Manning's disability.  Mr. Chasse's expression of the corporate ethos – that there was no light duty – was consistent with this lack of understanding.  Ms. Brothers admitted that, in 2002, she had received no training on handling requests for accommodation (Tr. 531).  Although she agreed initially to provide complainant the accommodation of a light duty assignment, Ms. Brothers said she did not ask Ms. Manning what she meant by "light duty," and

she claimed ignorance of what constituted a disability. She testified: "I don't know what disabled is. . . . I don't know what the word disabled is, but if I was disabled, I wouldn't work" (Tr. 513). Not only does this reflect a lack of understanding of the law, but it also illustrates her skepticism that Ms. Manning was truly disabled, which no doubt informed her decision to continue to pressure her to make sales.

Even the former Director of Human Resources was unaware of her legal obligation, which helped explain why the company had failed to train its managers on these issues. Ms. Forino denied that Ms. Manning ever requested an accommodation; she stated she was unaware that complainant needed an accommodation, but she was aware that she needed "light duty" (Tr. 388-89, 445, 450). She should have interpreted complainant's request for light duty as a request for an accommodation and handled it appropriately. Although the doctor's note was received in Ms. Forino's office in June 2002, she did not recall reviewing it. I also noted Ms. Forino's testimony that HealthFirst had not granted an accommodation prior to complainant's termination and subsequent lawsuit (Tr. 440). After proper notification, through complainant's conversation with her supervisor, the company had a duty to inquire about how to accommodate complainant's disability, and it did not. *See Felix*, 154 F. Supp. 2d at 658; *Varone*, OATH 695/01, at 11-12.

Although courts must refrain from second-guessing a company's decision-making process, they must also allow employees "to show that the employer's demands were illegitimate or arbitrary." *Meiri*, 759 F.2d at 995. While an employer may choose to terminate an employee based on a failure to meet expectations at any time during his or her tenure, the timing of respondents' decision to terminate Ms. Manning, shortly after she requested a reasonable accommodation for her disability, created an overwhelming inference that its decision was based upon her need for the accommodation. An employer is entitled to utilize objective and subjective criteria for evaluating its employees, so long as they are not discriminatory ones. *See Forrest*, 3 N.Y.3d at 308 n.5, 786 N.Y.S.2d at 392 n.5. Petitioner prevailed here in showing that respondents' stated reasons for the termination were false and were a pretext for discrimination.

**Damages**

Section 8-120 (a)(8) of the Human Rights Law empowers the Commission to fashion legal and equitable remedies for a complainant. Compensatory relief available includes lost

income and mental anguish damages. *See Comm'n on Human Rights ex rel. De La Rosa v. Manhattan and Bronx Surface Transport. Operating Auth.*, OATH Index No. 1141/04, at 10 (Dec. 30, 2004), *aff'd*, Comm'n Dec. (Mar. 11, 2005); *Comm'n on Human Rights ex rel. Rhodes v. Apollo Theatre Investor Group*, OATH Index No. 676/91 (June 14, 1991), *aff'd in part, modified in part*, Comm'n Dec. (Mar. 11, 1992), *modified*, Sup. Ct. N.Y. Co. Index No. 10056/92 (Apr. 20, 1993). Here, complainant seeks damages for lost wages of $27,500. Complainant has the burden not only to prove her damages, but also to demonstrate her effort to mitigate the loss of income by seeking other employment. *See Wilmot v. State*, 32 N.Y.2d 164, 344 N.Y.S.2d 350 (1973); *121-129 Broadway Realty Inc. v. NY State Division of Human Rights*, 48 A.D.2d 975, 369 N.Y.S.2d 837 (3d Dep't 1975).

Although complainant did not provide detailed testimony about her job search attempts, the burden of demonstrating that complainant's efforts at mitigation were not diligent falls on the respondents. *See Cornell v. T.V. Development Corp.*, 17 N.Y.2d 69, 268 N.Y.S.2d 29 (1966); *NY State Division of Human Rights v. North Queensview Homes, Inc.*, 75 A.D.2d 819, 427 N.Y.S.2d 483 (2d Dep't 1980). Respondent provided no evidence on the matter. In meeting her burden of establishing mitigation, complainant testified that, after her termination on June 28, 2002, she applied for positions with other health care companies and at temporary agencies; she presented her resume as supporting documentation (Tr. 74-76). In January 2003, she was hired at another health care company, Affinity Health Plan ("Affinity"), at a salary of $30,000 per year, substantially lower than her $50,000 salary at HealthFirst. She stopped working at Affinity in December 2004, and has been on long-term disability since then.[12] According to the evidence, complainant's damage award for lost income is established at $33,333, as calculated below:

Lost Earnings

HealthFirst salary, using $50,000 annual base, calculated for six months in 2002 ($25,000), nine months in 2003 ($37,500), and two months in 2004 ($8,333):

$70,833

Mitigation

---

[12]While employed by Affinity, complainant was disabled by her illness and unable to work from September to December 2003, and from March through December 2004 (Tr. 76); therefore, that time is excluded from the damages calculation.

Affinity salary, $30,000 annual base, calculated for nine months in 2003 ($22,500),
and two months in 2004 ($5,000):

$27,500

Unemployment insurance collected from July 2002 through December 2002:

$10,000
$37,500

Total Lost Earnings Damages                                         $33,333

Complainant seeks $250,000 in emotional distress damages. I did not find support for such a large damage award on this record. Damages for mental anguish may be awarded based upon whether "a reasonable person of average sensibilities could fairly be expected to suffer mental anguish from the incident." *Batavia Lodge v. NY State Division on Human Rights*, 35 N.Y.2d 143, 359 N.Y.S.2d 25 (1974), *rev'd and adopting diss. opin. reported at* 43 A.D.2d 807, 810, 350 N.Y.S.2d 273, 278 (4th Dep't 1973). Credible testimony by a complainant is sufficient to sustain the propriety of such an award. *See Cullen v. Nassau County Civil Service Comm'n*, 53 N.Y.2d 492, 442 N.Y.S.2d 470 (1981).

Ms. Manning testified that she suffered from stress and depression for approximately three months after her termination, which resulted in sleeplessness, depression, and lack of interest in her usual activities such as shopping (Tr. 71-73). Such awards should be consistent with past awards for similar injuries. *See School Bd. of Educ. of Chapel of Redeemer Lutheran Church v. NYC Comm'n on Human Rights*, 188 A.D.2d 653, 654, 591 N.Y.S.2d 531, 532 (2d

-29-

Dep't 1992). Considering the relatively short period of mental anguish and the lack of medical consequences, I recommend an award of $10,000. *See, e.g., Obstfeld v. Brandon*, 180 A.D.2d 638, 580 N.Y.S.2d 1018 (2d Dep't 1992) (sustaining award of $10,000 for humiliation and mental anguish caused by discrimination); *Comm'n on Human Rights ex rel. Thomas v. Space Hunters, Inc.*, OATH Index No. 997/04 (May 31, 2005) (award of $7,500 to transsexual discriminated against by room listing service); *Comm'n on Human Rights ex rel. Rhodes v. Apollo Theatre Investor Group*, OATH No. 676/91 (award of $12,000 damages for mental anguish for sex harassment in employment and retaliation).

30

Complainant also seeks an award of attorneys' fees, pursuant to section 8-502(f) of the Administrative Code, which gives discretion to the court to award costs and reasonable attorneys fees to a prevailing party. Specifically, Joseph & Herzfeld LLP, complainant's counsel, seeks $59,275 in attorneys' fees for legal services rendered by Oliver Herzfeld, Esq. ($13,600 at a rate of $425 per hour for 32 hours of work); Rebecca Height ($2,100 at a rate of $300 per hour for 7 hours); Charles Joseph, Esq. ($13,175 at a rate of $425 per hour for 31 hours); and Michael Palmer ($30,400 at a rate of $200 per hour for 152 hours) (Petitioner's Post-Trial Memorandum, p. 14-15 n. 19). Counsel cites the Commission's decision not to conduct the trial of this case as the reason for its request. A few months before the commencement of trial, the Commission reported to this tribunal that it would not conduct the trial of this case since the complainant was separately represented by private counsel (*see* Letter of Deputy Commissioner Avery Mehlman, dated December 3, 2004).

Section 8-502(f), the private right of action provision, provides for attorneys' fees where a complainant has prevailed in an action that she herself brought, not when she has prevailed in a case brought by the Commission. Counsel raises a unique issue here, where it asserts that the Commission refused to conduct the trial of this matter because Ms. Manning was independently represented by counsel, and it was left with no alternative course but to conduct the trial even though the firm had been retained only for purposes of settlement negotiations (Petitioner's Post-Trial Memorandum, at 14 n.19).

In fact, the Commission's attorneys participated minimally in the pre-trial and trial portions of this case. At trial, its attorneys asked only a few questions of the witnesses. The Commission submitted no legal memoranda. Consequently, private counsel conducted the entire trial and post-trial briefing. While the equities of counsel's argument are compelling, I did not find in section 8-502 sufficient authority to award them fees inasmuch as the private right of action accorded by that provision applies only where a person claiming to be aggrieved has not filed a complaint with the Commission. *See* Admin. Code § 8-502(a). Pertinent provisions of the Human Rights Law provide this tribunal with no discretion to award attorneys fees where the Commission has commenced an action on complainant's behalf.

Finally, this tribunal declines to order reinstatement of Ms. Manning to her former position inasmuch as her current long-term disability status appears to preclude her from being able to conduct the responsibilities of the position.

Tynia D. Richard
Administrative Law Judge

March 15, 2006

SUBMITTED TO:

**PATRICIA L. GATLING**
*Commissioner*

APPEARANCES:

**JOSEPH & HERZFELD, LLP**
*Attorneys for Complainant*
**BY: CHARLES JOSEPH, ESQ.**
   **MICHAEL PALMER, ESQ.**

**NATALIE WINFIELD-HOLDER, ESQ.**
*Attorney for Commission*

**ELISSA HUTNER, ESQ.**
*Attorney for Respondents*


**_Commission on Human Rights' Decision,   May 10, 2006_**

## THE CITY OF NEW YORK
## COMMISSION ON HUMAN RIGHTS

*In the Matter of*

### KISHANA MANNING
*Petitioner*

### HEALTHFIRST, LLC & JOSEPH CHASSE[13]
*Respondents*

### DECISION AND ORDER

On September 9, 2002, the petitioner files a Verified Complaint with the New York City Commission on Human Rights (hereafter referred to as the "Commission") alleging violations of the Administrative Code of the City of New York.  Specifically, the complaint alleged that the respondents denied petitioner a reasonable accommodation and terminated her employment on the basis of her disability.  In their Answer, the respondents state that they granted the petitioner a reasonable accommodation, which she relinquished on her own and that her termination was the result of poor performance, having nothing to do with her disability.

On August 12, 2004, the Commission reached a Probable Cause Determination and referred the matter to the Office of Administrative Trials and Hearings (hereafter referred to as "OATH" for a trial.

The trial was conducted before Administrative Law Judge Tynia D. Richard on March 2, 16 and 21, 2005.  ALJ Richard issued a Report and Recommendation on March 15. 2006.

The relevant evidence adduced at trial is as follows:

Respondent Healthfirst, LLC, hired the petitioner as a Marketing Representative on November 15, 1999.  In May 2002 the petitioner suffered from a kidney infection requiring a

---

[13] The original caption included Cheryl Brothers, complainant's supervisor.  Administrative Law Judge Richard determined that Ms. Brothers neither had an ownership interest in the respondent company, nor did she make the decision to terminate the complainant.  ALJ Richard recommended that since Ms. Brothers is not subject to individual liability, the action be dismissed against her.  The Commission accepts this finding.

hospital stay and a two-week absence from work.  Upon returning to work on June 3, 2002, petitioner requested and was granted an accommodation, resulting in her assignment to a clinic where she could perform her duties without the need of excessive walking, which aggravated her condition and caused pain and discomfort.  On June 6, 2002, the petitioner was called into a meeting wherein her performance and the need to achieve sales goals on a regular basis were discussed.  After the June 6th meeting, the petitioner returned to working from the van, which as indicated above, required the petitioner to walk around for several blocks in order to attract potential customers to the van.  The petitioner was terminated from her employment on June 28, 2002.  As indicated above, respondents contend their actions were based solely on an evaluation of the petitioner's performance, having nothing to do with her disability.  Respondents admit granting the petitioner an accommodation, i.e., the assignment to the clinic and admit telling petitioner that she would have to consistently meet or exceed her monthly sales goal; however, they deny requiring the petitioner to return to the van.  It should be noted that despite a request from petitioner's attorney to preserve documents relating to the petitioner, respondents were unable to produce documents that they contend corroborated their position that the petitioner was terminated due to poor performance.  Among the documents that respondents were unable to produce were the monthly sales figures for the petitioner and other similarly situated employees that would have provided a clear indication as to whether the petitioner failed to meet goals on a regular basis and how her performance compared to the other employees in the same title.  These documents would have been extremely helpful to the Commission and the ALJ since testimony revealed that employees were rarely required to meet 100% of their monthly goal in order to be considered above average employees.  Under the circumstances, ALJ Richard appropriately granted the petitioner's request that the court infer that the missing documents would have been favorable to the petitioner. Petitioner concedes that she was given a "performance improvement plan" on January 15, 2002; however, she provided two above-average evaluations dated October 17, 2001 and February 20, 2002; a Certificate of Excellence for the week ending 1/18/02, Certificated of Achievement for the weeks ending 3/31/02, 3/19/02 and 5/10/02; as well as a Certificates of  Achievement for the month of April 2002; all of which indicate that she was successful in  improving  her  performance  and  contradict  the  respondent's  assertions  that

34

petitioner's performance was below standards. Also worthy of note is that respondent Chasse, who testified that petitioner was a poor employee signed the above-referenced certificates.

The evidence clearly establishes that the respondents failed to engage in a dialogue with the petitioner regarding an appropriate accommodation, including whether or not there was another position in the company the petitioner would be capable of performing until she was fully recovered. ALJ Richard indicated that the respondents should be required to accept sub-standard performance from a disabled individual, i.e., lower sales; however, the Commission disagrees. The law requires that a disabled individual perform the essential requisites of the position. If attaining 100% of a monthly sales goal is an essential requisite of the position, petitioner, though disabled, should be required to meet that goal; however, as indicated, the evidence revealed that attaining 100% of the goal was not required; therefore, requiring the petitioner to perform at a higher level than her co-workers and terminating her employment for allegedly failing to perform at that level is discriminatory and a violation of the city's Human Rights Law. In light of the respondent's failure to engage in a dialogue with the petitioner, the appearance that the respondents were holding the petitioner to a higher standard than her co-workers and the fact that the documentary evidence raises serious concerns regarding the respondents' credibility (not to mention the inference created by respondent's failure to retain and produce documentation that could have been favorable to the petitioner), the Commission would have ruled in favor of the petitioner without further analysis. ALJ Richard, however, accepted the respondents' non-discriminatory reason for the petitioner's termination, i.e., poor performance, and continued the analysis to determine whether that reason was, in fact, a pretext for their discriminatory animus. ALJ Richard considered the documentation signed by respondent Chasse showing that the petitioner was a valued employee and considered the inference in favor of the petitioner created by the respondents' failure to retain and produce relevant documents in reaching the appropriate conclusion that respondents' non-discriminatory reason for terminating the petitioner was a pretext.

In light of this finding, ALJ Richard recommended that the respondents be ordered to pay the petitioner compensatory damages in the amount of $33,333 for her lost wages and $10,000 for her mental anguish. ALJ Richard decline the petitioner's request for attorney fees since such are not authorized by the Administrative Code and also declined to order the petitioner's

reinstatement since she would be unable to perform the duties of the position at her current level of disability. The Commission believes that these findings and recommendations are appropriate and adopts them.

IT IS HEREBY ORDERED, that the respondents pay the petitioner $43,333, $33,333 in compensatory damages (lost wages) and $10,000 for pain and suffering (mental anguish).

Failure to abide by this Order may result in penalties authorized by section 8-124 of the Administrative Code of the City of New York.


**SO ORDERED:**

**GRACE LYU-VOLCKHAUSEN,** *Commissioner,* NYC Commission on Human Rights

**MATTHEW FOREMAN,** *Commissioner,* NYC Commission on Human Rights

**PATRICIA L. GATLING,** *Commissioner,* NYC Commission on Human Rights