1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF NEW YORK

3  ISAAC PASCHALIDIS,            .   Docket No. 1:20-CV-2804-LDH-
                                 .   RLM
4       Plaintiff,               .
                                 .
5          v.                    .   Brooklyn, New York
                                 .   Thursday, September 8, 2022
6  THE AIRLINE RESTAURANT        .   12:02 p.m.
   CORP. ET AL.,                 .
7                                .
        Defendants.              .
8   . . . . . . . . . . . . . .  .

9   .

10

11         TRANSCRIPT OF TELEPHONIC DISCOVERY HEARING
              BEFORE THE HONORABLE ROANNE L. MANN
12                UNITED STATES MAGISTRATE JUDGE

13  APPEARANCES:

14  For the Plaintiff:          Brach Eichler, LLC
                                ERIC MAGNELLI, ESQUIRE
15                              101 Eisenhower Parkway
                                Roseland, New Jersey  07068
16                              973-228-5700

17  For the Defendant:          Franklin, Gringer & Cohen, PC
                                DANIELLE E. MIETUS, ESQUIRE
18                              666 Old Country Road
                                Suite 202
19                              Garden City, New York  11530
                                516-228-3131
20

21
    Transcription Service:      Superior Reporting Services LLC
22                              P.O. Box 5032
                                Maryville, TN 37802
23                              865-344-3150

24

    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

1    P R O C E E D I N G S

2         THE COURT:  This is Judge Mann on the line.  I am

3    conducting a telephonic discovery hearing in Paschalidis vs.

4    The Airline Restaurant Corp., et al.; 1:20-cv-2804.

5         Let me start by thanking everyone for making

6    yourselves available on relatively short notice.

7         I'm going to start by taking the roll call in the

8    case.  Who is on the line on behalf of the plaintiff?

9         MR. MAGNELLI:  Good afternoon, Your Honor.  Eric

10   Magnelli from Brach Eichler, LLC, on behalf of plaintiff.

11        THE COURT:  Welcome.  And who is on the line on

12   behalf of the defendants?

13        MS. MIETUS:  Good afternoon, Your Honor.  This is

14   Danielle Mietus from Franklin, Gringer & Cohen, on behalf of

15   the defendants.

16        THE COURT:  All right.  And is there anyone else on

17   the line with either of you, whose appearance I should take

18   at this point?

19        MR. MAGNELLI:  None from plaintiff, Your Honor.

20        MS. MIETUS:  None from the defendants.

21        THE COURT:  All right.  So I've set up this hearing

22   in response to the defendant's letter motion to compel

23   discovery from plaintiff.  There are effectively two sets of

24   discovery demands that defendant is seeking to compel from

25   plaintiff.

1       The first one, concerns interrogatory 10 and

2  document requests 9 through 11, as well as interrogatories 13

3  and 14 and document request number 14.  The latter is the

4  second issue.  The first one concerns discovery demands, as

5  to concerning whether the plaintiff was employed by any --

6  defendant's employment during the six-year period preceding

7  the filing of this lawsuit or whether plaintiff was an owner

8  and/or shareholder of any other entity.

9       Let me begin by just getting clarification from

10  defense counsel.  In footnote 1, you reference tax returns,

11  which would fall within the scope of the document demand

12  relating to this issue.  And you indicate defendants reserve

13  their right to compel the production of the same.  Do I

14  understand from that, that the defendants are not, at this

15  point, seeking to compel the production of tax returns?

16       MS. MIETUS:  That would be correct, Your Honor.  As

17  long as the plaintiff is able to produce some type of other

18  documents that would reflect the information that would be

19  contained in his own individual income tax returns.

20       THE COURT:  Because I would note that the case that

21  you cite regarding the production and discovery of tax

22  returns, was one in which the court specifically granted a

23  protective order in a wage and hour case, and indicated that

24  before tax returns would be produced, the movant would have

25  to show both relevance and a compelling need, neither of

1   which have been adequately demonstrated, at this point.

2           So that is not an issue, but there is an objection

3   that's been raised by plaintiff.  Plaintiff's position is

4   that he did not have other employment during the relevant

5   time period, and the plaintiff's position is that any

6   ownership interest in any other company, whether he owned or

7   was a shareholder, would be irrelevant to the issues in this

8   case.  And the example that plaintiff's counsel gives, is

9   companies in which plaintiff may have had a passive or

10  minimal ownership interest, such as stock in Google.

11          I would like to cut through the back and forth on

12  this issue.  I agree with plaintiff that the plaintiff's

13  ownership of stock in Google, or any other passive ownership

14  interest in a publicly traded company, would be totally

15  irrelevant.  But I don't view the defendants as seeking that

16  kind of information.  They're seeking information, even

17  though it's not expressly stated, but I construe it to mean,

18  is there any closely held entity, non-public corporation, in

19  which the plaintiff had an ownership interest?  And if the

20  answer to that is yes, then that certainly could be relevant

21  to how much time he had to devote to his employment with the

22  defendants, if he was managing another business.

23          So let me ask plaintiff's counsel: During the six

24  years preceding the filing of this lawsuit, did the plaintiff

25  have any kind of an ownership interest in a closely held

1 entity, as opposed to a publicly traded corporation?

2      MR. MAGNELLI:  Your Honor, I believe, and I don't

3 know all the details of it, but I believe he owns some

4 property.

5      THE COURT:  And when you say he owns property, is

6 this property that he rents out?

7      MR. MAGNELLI:  I believe so.  You know, it's some

8 form of investment property, like a passive investment in

9 certain real estate.  I believe that is the case.

10      THE COURT:  And is he responsible for managing the

11 property in any way?

12      MR. MAGNELLI:  No.  Not to my understanding, Your

13 Honor, no.

14      THE COURT:  Well, this is really an issue that the

15 parties should have been able to come to some agreement on,

16 rather than staking out extreme positions.  And when I say,

17 extreme positions, I think that the defendants were entitled

18 to seek this information, and that the plaintiffs should have

19 provided a response.  But whether the defendants are entitled

20 to the full scope of the documents that they've demanded, is

21 another matter.

22      I'm looking at the document demands, in which the

23 defendants are requesting all documents concerning and/or

24 reflecting all income of any kind that would include tax

25 returns.  I think if the parties had reached an agreement on

1   what was within the scope of the relevant ownership interest,

2   they could have come to an agreement, in terms of how much

3   documentation has to be produced.  If the plaintiff owns

4   property that he rents out, I think the defendants are

5   entitled to explore that and not simply to accept the

6   plaintiff's assertion that through counsel during this

7   proceeding, that he's not responsible for managing it,

8   because there may be a lot of activity required of him, even

9   if he isn't technically a manager of the property.

10          Mr. Magnelli, other than owning investment

11  property, does he have any other ownership interest in any

12  kind of business or entity, other than a publicly-traded one,

13  where he's a passive owner?

14          MR. MAGNELLI:  The only other two, which defendants

15  are aware of, are two other entities in which he has a

16  minimal interest in and really has no responsibilities.  And

17  the reason why defendants know about it, is because the

18  defendants are majority owners in those two companies.

19          THE COURT:  Well, let me hear from Ms. Mietus.

20          MS. MIETUS:  Thank you, Your Honor.  The defendants

21  are involved in one other entity, as my understanding is,

22  with the plaintiff; however, I did attempt to kind of confer

23  with counsel on some of these issues and see if we could

24  reach some type of agreement.  But we, unfortunately, were

25  not able to do so.

1    So certainly what Your Honor stated at the

2  beginning of the call, was really what the first category of

3  requests were geared towards.  And exploring how plaintiff

4  essentially devoted his time, and whether other interests

5  that he may have had really detracted from any purported

6  responsibilities that he had at the defendants' restaurant.

7    With respect to some of the other entities that

8  counsel mentioned, I do believe that the plaintiff was also

9  potentially involved in operation of another restaurant as

10  well.  And my clients don't have that, kind of, exact

11  information, which certainly they would be entitled to

12  explore.

13    THE COURT:  And is this a restaurant in which the

14  defendants, or any of the defendants, have an interest as

15  well?

16    MS. MIETUS:  I do not believe so, but I'm not

17  entirely certain.

18    THE COURT:  Well, Mr. Magnelli, are you aware of

19  any other restaurant in which the plaintiff had any kind of

20  ownership or management responsibility?

21    MR. MAGNELLI:  Absolutely not, Your Honor.  In

22  fact, I think that is a completely made-up statement;

23  absolutely none.  I don't know where that came from.

24    THE COURT:  Well, I would prefer not to have to go

25  through each of the document demands and to specify, in

1  particular, what must be produced.  It's somewhere between

2  objection, irrelevant, and we want any and all documents

3  concerning the plaintiff's interest in these entities.  There

4  should be documents produced, such that one can ascertain

5  from documentation what the plaintiff's role was, and whether

6  it was an active or passive role.  So can counsel work out

7  these issues on your own?

8          MR. MAGNELLI:  Your Honor, this is Mr. Magnelli, we

9  can speak.  I do think this establishes a dangerous

10  precedent, though, because this is now putting on the

11  employee the burden to prove the hours he worked, when an

12  employer has absolutely no time records.  And where is the

13  line?  Does he now have to produce daily calendars of kids'

14  soccer games, just to show whether or not?

15          The simple answer is, let defendants produce the

16  time cards, the time records, to see if he did or did not

17  work on that day.  And they haven't done that, because they

18  clearly don't exist.  And now, to try to have him divest --

19  to disclose every source of investment income he has, I think

20  that's a slippery slope, Your Honor.  But I will definitely,

21  if Your Honor wants us to, further discuss this with counsel

22  and see if we can reach some sort of, you know, resolution.

23          THE COURT:  Well, I disagree with your parade of

24  horribles.  We're not talking about him turning over every

25  record that he might have that would bear on how he spent his

1   time.  We're talking about ownership interest, and I

2   specifically said I excluded, in publicly traded companies,

3   in which it would clearly be a passive interest.  But if

4   you're talking about someone who is an employee at a

5   restaurant, and if he's owning real estate, you know,

6   certainly he should have to turn over some information,

7   because owners of real estate have substantial

8   responsibilities.  And I'm not ordering him to turn over

9   every single document relating to those properties, but there

10  should be some documentation that can be produced, from which

11  the defendants can determine whether or not this was merely

12  passive, or whether this, in fact, was a business in which

13  the plaintiff was actively participating.

14          And this is an unusual situation.  Most wage and

15  hour cases involve people who are working for minimum wage

16  and they don't even own the home that they live in; they're

17  renters.  So to suggest that requiring him to produce general

18  categories of ownership of businesses, I reject the notion

19  that this is a slippery slope.

20          And the fact that, you know, yes, the plaintiff, in

21  the absence of any records kept by the defendant employer, is

22  entitled to rely on his own recollection of his hours worked,

23  that doesn't mean that his recollection is irrebuttable.

24          All right.  Now, let's turn to the issue of

25  damages, which is the second area of dispute.  And the

1  defendants are asking for supplemental responses to

2  interrogatories 13 and 14, and to document request number 14.

3  So let me just get those in front of my, so I'm not flipping

4  back and forth.

5          Interrogatory 13 was, "Compute each category of

6  damages sought by plaintiff for each claim alleged in

7  plaintiff's amended complaint."  The answer that was provided

8  is, "Unpaid regular wages of approximately $100,000; unpaid

9  overtime wages of approximately $200,000; back pay, front

10 pay, and lost benefits of approximately $500,000, plus a

11 category interest, liquidated damages, emotional distress,

12 punitive damages, and statutory penalties," and that's in the

13 plaintiff's supplemental responses.

14          Now, defense counsel has cited several cases that

15 stand for the proposition that rule 26(a) -- this is just for

16 automatic disclosures or initial disclosures -- rule 26(a)

17 requires more than providing, without any explanation,

18 undifferentiated financial statements, and I'm quoting from

19 the Second Circuit's decision and design strategy, "It

20 requires a computation supported by documents."  And

21 plaintiff's counsel has distinguished design strategy in

22 several of the other cases, by saying that in design

23 strategy, the plaintiff had omitted an entire category of

24 documents, lost profits; that is true.  The issue in that

25 case was preclusion.  We're now dealing with discoverability.

1    The Second Circuit did not rely solely on the fact

2    that the plaintiff had ever disclosed lost profits, but that

3    was the first rationale.  The second was that, "Rule 26(a)

4    requires a computation, supported by documents."  So

5    presumably in design strategy, if design strategy had

6    included a category of lost profits and said, $10,000,000, it

7    follows under the second rationale of the Second Circuit,

8    that that would not be sufficient.  There would have to be

9    some basis for that calculation.

10    The plaintiff's argument that the plaintiff does

11    not have the documents, that it was defendant's obligation to

12    retain common pay records, misses the mark.  In a wage and

13    hour claim, when a plaintiff bases a damages calculation or

14    demand on the plaintiff's estimate of the number of the hours

15    worked, the plaintiff's counsel prepares a chart with a

16    calculation, based on those estimates.  That is routinely

17    provided as part of initial disclosures.  And in multiple

18    settlement conferences that the court has held, the plaintiff

19    produces those calculations.

20    I ask plaintiff's counsel, Mr. Magnelli, how did

21    you come up with the number $100,000 in unpaid regular wages?

22    How did you come up with that number?  Did you pluck it out

23    of the air, or did you do a calculation?

24    MR. MAGNELLI:  Well, as I alluded to in the

25    opposition letter motion, I took the days and times that he

1  estimated that he worked, and did a multiplication.  If this

2  resolves the issue, Your Honor, I'll be more than happy to

3  show my work.

4          THE COURT:  I presume, and I know there are

5  programs that do that, so you don't actually have to do the

6  math, you just fill in the numbers.  Do you have a chart?

7          MR. MAGNELLI:  I used a pen and a paper and did

8  math.  And if it helps defendants to move this case along, I

9  will show the work.  I will supplement this interrogatory

10  answer with multiplication signs and additions, so they can

11  see the hours, the days.  It's three paragraphs in the

12  complaint.  I'll take those days and times, and I'll multiply

13  it by salary/hourly rate, and it will come up to the $100,000

14  for the overtime, and obviously the rest is self-explanatory.

15  But I will gladly supplement it for them, if it will move

16  this case along.

17          THE COURT:  Well, I'm not sure if you're suggesting

18  that you have documents that show how you came up with these

19  numbers, or whether you're saying you will come up with

20  documents to support these numbers; which is it?

21          MR. MAGNELLI:  Your Honor, I don't have documents,

22  because the plaintiff does not have his time sheets or his

23  time cards.  So he, by his recollection, told us, which is in

24  the complaint, the hours and days that he worked.

25          THE COURT:  I understand that.  I'm not asking

1  about the underlying records supporting his recollection.

2  I'm asking about the records supporting the calculation of

3  damages.  Do you actually have a sheet of paper on which you

4  did the multiplication, or are you saying you will do that

5  now?

6          MR. MAGNELLI:  At one point I know I had one on a

7  pen and paper.  Whether it got scanned into the system and

8  saved, I can double-check.  But if I don't still have that

9  piece of paper, I will, I mean, recreate it; it's not

10  difficult.

11         THE COURT:  You know, the numbers that you've

12  provided in response to the interrogatory are so rough, that

13  if you are going to redo the damages calculation, you might

14  want to do it, rather than by hand, but use one of these

15  programs, you know, where you fill in the number of hours per

16  week, the number of weeks per year, what the hourly rate was,

17  and then you come up with a number, with the understanding

18  it's approximate, because at bottom, it's based on his

19  recollection.  But I doubt that it would come up $100,000 for

20  unpaid wages or $200,000 for unpaid overtime.  You're

21  actually going to come up with a specific sum, based on the

22  estimated number of hours as recalled by plaintiff.

23         MR. MAGNELLI:  I will do that, Your Honor.

24         THE COURT:  But you'll do that because that is what

25  the rule requires, and that is what the defendant is entitled

1   to.  Now, you say that the defendant can recreate these

2   hours, but the defendant undoubtedly will say, plaintiff

3   didn't work the number of hours that he claims he did.  So

4   they're going to come up with entirely different numbers, but

5   they're entitled to know how you generated the damages

6   numbers that you're alleging.

7           MR. MAGNELLI:  And, Your Honor, I will do that,

8   obviously to the best of the ability, considering there are

9   no time records.  But I will do that.

10           THE COURT:  And with respect to the emotional

11   distress damages, that is the one area in which you can't

12   come up with an arithmetic calculation.  That's an estimate

13   of what you believe the emotional damages are worth.  But

14   nevertheless, the defendants are entitled to know what that

15   number is, because within this circuit there is a distinction

16   between garden-variety emotional distress versus extreme

17   emotional distress.  What is the number that you're placing

18   on the plaintiff's emotional distress damages?

19           MR. MAGNELLI:  Your Honor, and it's somewhere in

20   other discovery responses.  There are no psychologists, there

21   is no psychiatrist, there are no doctors, so this would be

22   garden-variety emotional distress, which is, in my

23   understanding, a jury determination.

24           THE COURT:  Well, it is, but the defendants are

25   entitled to know, what is the number that you are placing on

1  it?

2  MS. MIETUS:  And, Your Honor, if I may, defendants'

3  request also encompasses, more specifically, the

4  interrogatories, the actual details of what the plaintiff's

5  alleged garden-variety emotional damages are.  We have no

6  information; aside from he's seeking emotional damages.

7  There is no description anywhere in the amended complaints or

8  in any other discovery response.

9  THE COURT:  Well, you're jumping ahead, now, to

10  interrogatory 14; I was still on 13, which was the

11  computation of each category of damages.  So I will get to

12  number 14, but let's first talk about if the plaintiff were

13  now to make a demand, an emotional distress damages demand,

14  what would that amount be?

15  MR. MAGNELLI:  Your Honor, I've never even thought

16  about that, because garden-variety emotional distress, in

17  every case I've ever been in, has always been a jury

18  determination.  I can say it's $10, I could say it's

19  $1,000,000; the jury will determine that.  I mean, there's

20  case law --

21  THE COURT:  Well, if it's $1,000,000, it's not

22  garden variety, so I can tell you right now, it's not

23  $1,000,000.

24  MR. MAGNELLI:  Right.  And I know there's case law

25  that determines what, you know, the range of garden-variety

1  emotional distress damages are.  But as defendants know, the

2  emotional distress damages are not based off of anything

3  medical -- medical records or a psychiatrist or a

4  psychologist.

5          THE COURT:  That is true.  But still, you're

6  required under rule 26(a), to provide a computation of each

7  category of damages, claimed by the disclosing party.  So

8  regardless of who ultimately will be deciding that issue, if

9  the case were to go to trial, what is the value of the

10  emotional distress damages that the plaintiff is now

11  claiming?  They're entitled to know that.  You don't have to

12  provide a calculation as to how you got to that number, but

13  they are entitled to know what that number is.

14          MR. MAGNELLI:  Your Honor, as I sit here right now,

15  I cannot provide a number, but I will supplement the answer,

16  in accordance with the case law and Your Honor's opinion.

17          THE COURT:  All right.  And similarly, for punitive

18  damages, now statutory penalties, I assume that's going to

19  come to the maximum, the cap under the New York Labor Law, so

20  we're probably talking about a total of $10,000.  Is that

21  correct, Mr. Magnelli, for the statutory penalties?

22          MR. MAGNELLI:  Yes, Your Honor.

23          THE COURT:  And punitive damages, you don't know

24  the number now?

25          MR. MAGNELLI:  Again, Your Honor, that's a jury

1  decision.  What my number is, is irrelevant, because that's

2  up to a jury to decide.  I've never been in a situation where

3  I instruct the jury or a judge instructs the jury, as to what

4  the emotional damages' number is.  There is a range that's

5  allowed under the law.

6       THE COURT:  The issue isn't what you instruct the

7  jury, it's what's discoverable.  We're talking now about

8  discovery, and under rule 26(a) of the Federal Rules of Civil

9  Procedure, the defendants are entitled to know your

10 evaluation, at this point, of your client's emotional

11 distress damages and the punitive damages.  This is not a

12 question of what goes to the jury; it's noticed to the

13 defendants.

14      If, for example, you were to come back with

15 $1,000,000 for emotional distress or let's say you said

16 $100,000,000 for punitive damages, I'm sure there'd be in

17 limine motions they would want to file.  So this is just a

18 question of notice, and you don't need to provide an

19 underlying calculation, but you need to provide, in effect,

20 what the demand is.

21      MR. MAGNELLI:  Your Honor, I will research what the

22 allowable amount is, and I will provide defendants with a

23 supplemental answer.  As I sit here today, I can't provide an

24 answer.

25      THE COURT:  All right.  And then moving on to

1    interrogatories.  Did we just lose someone, or did someone

2    just join?

3              THE CLERK:  Judge, I believe we just lost someone.

4              MR. MAGNELLI:  I'm still here, Your Honor.

5              THE COURT:  All right.  So we'll have to wait for

6    Ms. Mietus to dial back in.  Ms. Mietus?

7              MS. MIETUS:  Yes.  I apologize, I had some

8    technical issues.

9              THE COURT:  All right.  Well, we were just waiting

10   for you to dial back in.  So I was about to question Mr.

11   Magnelli and you on interrogatory 14, which asks, "Identify

12   and describe in detail the irreparable injury and monetary

13   damages, including lost wages, lost fringe benefits, and

14   emotional distress that plaintiff claims he has suffered."

15   So plaintiff is going to be providing a supplemental response

16   to question number 13.  That will include, in effect, his

17   demand for emotional distress damages and punitive damages.

18   There won't be any underlying calculation.

19             As for the other elements of his damages, he will

20   be providing the calculation of how he got to that number.

21   And I take it since the plaintiff, himself, did not keep any

22   records of his days worked and pay -- actually, I'm jumping

23   ahead, because now I'm already thinking about the document

24   demand.  Let's just focus on interrogatory 14, "Identify and

25   describe in detail the damages."  And I think that will be

covered by the response to number 13, and in terms of lost

fringe benefits, there will have to be some calculation as to

the estimate of lost fringe benefits.  And describe in

detail, if we're talking about lost fringe benefits, there

are different fringe benefits, so those should be identified.

As far as his emotional injuries, we have a

statement on the record from counsel that the plaintiff did

not seek any professional help, so we're not going to have

any reference to money spent in therapy, but he should

describe his emotional injuries.  Are we saying that he was

depressed?  Are we saying that he suffered from insomnia?  He

should describe what the emotional distress injuries

consisted of.

Turning now to document demand number 14, "Produce

all documents concerning plaintiff's claim for damages."

That will be counsel's calculations, and to the extent that

plaintiff has any underlying records that bear on any of

these damages, those should be produced.  It's my

understanding from plaintiff's counsel's representations in

the letter and during this proceeding, that he doesn't have

any underlying documents.

All right.  Let's set a deadline for the

supplemental submissions.  I would note, and I should have

noted this at the outset, that today is September 8th, which

is the deadline for completion of fact discovery.

1   Defendant's letter motion on these discovery issues, at the

2   end sought additional time for discovery, but there was no

3   indication that that matter had been addressed with Mr.

4   Magnelli.  And by the same token, Mr. Magnelli, in his

5   response, requested that the court rescind its order, sending

6   the case to mediation.  That apparently has not been

7   discussed between counsel either.

8           So let's first talk about how much time Mr.

9   Magnelli needs, in order to complete this supplementation of

10  discovery, consistent with the court's rulings, and including

11  a period of time when counsel can confer with respect to the

12  first disputed issue, that is the plaintiff's ownership in

13  any closely held business.  How much time are we talking

14  about?

15          MR. MAGNELLI:  Your Honor, I think two weeks is

16  sufficient.

17          THE COURT:  And I was going to propose two weeks.

18  Ms. Mietus, is that agreeable?

19          MS. MIETUS:  Yes, Your Honor.

20          THE COURT:  All right.  So that would bring us to

21  September 22nd.  And I think I would also like a joint status

22  report that this matter has been resolved.  I'll give the

23  parties until September 28th to file a joint status report.

24          Now, court-annexed mediation was supposed to be

25  completed by September 15th.  Have the parties even selected

1   a mediator?

2           MR. MAGNELLI:  Plaintiff has, Your Honor.  But I'm

3   still waiting on defendants to pick one.

4           THE COURT:  Ms. Mietus?

5           MS. MIETUS:  And defendants' counsel is proposing a

6   single mediator.  And I conveyed to counsel that defendants

7   are certainly willing to participate in mediation; however,

8   the discovery issue is that given a deadline prior to the

9   mediation completion deadline, has to be worked out prior to

10  getting into any mediation issues.  I will certainly provide

11  counsel with a response and propose a few mediators.

12          THE COURT:  Well, the parties should not have

13  waited until a week before the deadline for completing

14  mediation to be having these discussions about who the

15  mediator is going to be.  Ms. Mietus, do the defendants

16  consent to the plaintiff's proposed mediator?

17          MS. MIETUS:  I will review.  At this time I'm not

18  prepared to consent on the record.  I do not recall who

19  counsel proposed as the mediator.

20          THE COURT:  All right.

21          MR. MAGNELLI:  Her name is Sarah Fuller; she's an

22  Eastern District of New York mediator.

23          THE COURT:  Well, this is court-annexed mediation,

24  so everyone on the panel is who's been approved by the judges

25  of the Eastern District.  But this really should have been

1  done long ago, and I take it both sides are in agreement that

2  discovery should be extended and the deadline for completing

3  mediation should be extended?

4      MR. MAGNELLI:  Your Honor, I don't think it's

5  necessary to extend discovery, at this point.  As of right

6  now, expert discovery ends December 9th.  I don't see a

7  reason why we can't have this case wrapped up in three

8  months, and neither of us have indicated that we actually

9  need an expert.  So we can just take the expert discovery

10  time and use it for fact discovery.  That's my thought.

11      THE COURT:  Well, that is not adhering to the

12  court's schedule.  Because if there are not going to be

13  experts, then the court will vacate the expert discovery

14  schedule.  Today is the last day for fact discovery.  So the

15  question is, should fact discovery be extended?  And then

16  there's a separate question of whether the court should

17  simply vacate the schedule for expert discovery.  Ms. Mietus?

18      MS. MIETUS:  Yeah.  Given some of the issues that

19  we have encountered, certainly fact discovery needs to be

20  extended.  The information that plaintiff will be producing

21  by September 22nd will be needed to move forward with

22  plaintiff's deposition.

23      THE COURT:  And are defendants planning to rely on

24  experts?

25      MS. MIETUS:  Not at this time, Your Honor.  But

1　certainly we would like to, at this time, reserve our right

2　to utilize an expert.

3　　　　THE COURT:  All right.  What I'm going to do, I'm

4　going to vacate the schedule set for expert discovery, since

5　it seems more likely than not, that the parties are not going

6　to be retaining experts.  And I'll give the parties until

7　October 14th to complete fact discovery.  And I'll give them

8　until October 28th to complete a court-annexed mediation.  I

9　want you to select a mediator, and by that I mean agree upon

10　a mediator, within a week from today.  And I'll give the

11　parties until November 3rd to submit a joint status report.

12　　　　If the case is settling, you should indicate to the

13　court that as a result of court-annexed mediation or

14　otherwise, the case is settling.  If it's not, you should

15　indicate that fact discovery has been completed, and if at

16　that point either side wants to retain an expert, you should

17　request that the court impose a new expert discovery

18　schedule.  And in addition, if there are going to be any

19　dispositive motions, the parties should indicate whether or

20　not either side intends to make a dispositive motion.

21　　　　All right.  I think that covers everything that I

22　had intended to.  Is there anything else that either of you

23　would like to address?

24　　　　MR. MAGNELLI:  Nothing for plaintiff, Your Honor.

25　　　　MS. MIETUS:  Nothing further from defendants.

1      THE COURT:  All right.  In that case, I'm going to

2  conclude this proceeding.  Both of you please take care and

3  stay safe.  Good-bye.

4  (Proceedings adjourned at 12:48 pm)

5

6               TRANSCRIBER'S CERTIFICATE

7      I certify that the foregoing is a correct

8  transcript from the electronic sound recording of the

9  proceedings in the above-entitled matter.

10

11     *Patricia J. Dunham*              September 14, 2022

12

13  _____     _____

14  Patricia J. Dunham                      DATE

15  Legal Transcriber

16

17

18

19

20

21

22

23

24

25

Superior Reporting LLC
P.O. Box 5032 Maryville, TN 37802
transcripts@superiorreporter.com